[Crim. No. 22956. Aug. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE J. KEENAN, Defendant and Appellant.

482

484

486

COUNSEL

Frank O. Bell, Jr., Harvey R. Zall, State Public Defenders, Jean R. Sternberg and Joel Kirshenbaum, Deputy State Public Defenders, under appointments by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Herbert F. Wilkinson, Robert R. Granucci and Morris L. Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

EAGLESON, J.—In San Francisco Superior Court, a jury convicted defendant Maurice J. Keenan of one count of first degree murder (Pen. Code, §§ 187, 189),[1] one count of burglary (§ 459), one count of robbery (§ 211), and two counts of attempted robbery (§ 664), all with personal use of a firearm (§ 12022.5). Defendant also sustained convictions for possession of a sawed-off shotgun (§ 12020) and of a concealable firearm by an ex-felon (§ 12021). Under the 1978 death penalty law, the jury found true special circumstances that the murder was committed in the course of a robbery

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

(§ 190.2, subd. (a)(17)(i)) and of a burglary (*id.,* subd. (a)(17)(vii)). After a penalty trial, the jury sentenced defendant to death. The automatic motion to modify the verdict (§ 190.4, subd. (e)) was denied, and a death judgment was entered. This appeal is automatic.

We find no prejudicial error at either the guilt or penalty phases. We will therefore affirm the judgment in its entirety.

## I. GUILT TRIAL

### A. *Prosecution case.*

On the evening of July 8, 1979, Robert Opel was shot to death in his art gallery at 1287 Howard Street in San Francisco. Defendant and Robert Kelly were jointly charged and tried for offenses culminating in Opel's murder.[2] Compelling eyewitness and circumstantial evidence tied them to the crimes.

The principal prosecution witnesses were Anthony Rogers and Camille O'Grady, friends of the murder victim. Rogers and O'Grady gave similar accounts of the incident. Both testified that Opel lived in an apartment at the rear of the storefront gallery space. The gallery, which specialized in erotic art, was self-supporting, but Opel also supplemented his income by selling drugs, principally amphetamines and phencyclidine (PCP). Drugs were frequently present on the premises.

On July 8, 1979, Rogers and O'Grady visited Opel at the gallery, then attended an early evening swim party at a neighborhood bar. They returned to the gallery around 8:30 or 9 p.m. to check on Opel, who was in bed with bronchitis. Presently the street doorbell rang, and Opel went to answer it. Rogers followed Opel into the gallery area. He saw two men enter, one carrying an attache case. This man, identified at trial as defendant, set the case down on a raised "stage" area and opened the combination lock. Saying "this is for or from Dana," he withdrew an automatic pistol. Simultaneously the other intruder, identified as codefendant Kelly, took a sawed-off shotgun from the case.

Defendant pointed the handgun at Opel, while Kelly brandished the shotgun at Rogers. Both robbers demanded drugs or money. Opel replied he had nothing and insisted they leave. Meanwhile O'Grady walked into the

---

[2] Kelly was identically charged with murder, burglary, robbery, and attempted robbery. Prior-felony enhancements applicable only to defendant were omitted from Kelly's information, and no special circumstances were alleged as to Kelly.

gallery area. Kelly placed the shotgun to her neck and threatened to blow her head off if he and defendant did not get what they wanted. Both men continued to demand money or drugs; Opel repeatedly insisted that he had nothing and they should leave his "space."

Defendant then ordered Kelly to escort Rogers and O'Grady to the back and "take them out." Kelly forced them to the kitchen in the rear of the gallery, directed them to sit on the floor, and held the shotgun on them. O'Grady sat facing the kitchen door, which led through a short hallway into the gallery.

Kelly took $5 and a camera offered by Rogers and rifled through O'Grady's bag. Meantime, O'Grady and Rogers overheard a continuing argument between defendant and Opel in the gallery area. Defendant said, "I'll blow your head off." O'Grady saw defendant, who for some period was standing in the kitchen doorway, fire a shot upward toward the ceiling. She then heard a second shot and a shattering sound, after which the raised voices of Opel and defendant were still audible. Finally there was a shot followed immediately by the sound of a falling body. Apparently Kelly was also in the gallery area at that moment.

Meanwhile, according to Rogers, other tenants in the building had heard the commotion and were coming down the stairs to investigate. Kelly, still carrying the shotgun, returned to the kitchen. Defendant yelled to Kelly, "Kill them both. Let's get out of here. There's a crowd gathering." Kelly ripped a telephone cord from the wall and tied Rogers's and O'Grady's hands behind their backs. He told them they would die if they ever saw or identified the robbers. Once satisfied the intruders had left, Rogers and O'Grady freed themselves and entered the gallery. There they found Opel on the floor, breathing heavily.

Opel had received a small-caliber gunshot wound to the head. He later died of the injury. The physical evidence indicated the fatal shot had been fired from relatively close range, probably less than a foot.

Though both Rogers and O'Grady saw defendant only for relatively brief periods, they testified that the light and distance were good, and that they observed him clearly.[3] The night after the murder, O'Grady, who had worked as an artist, drew memory sketches of the robbers. The sketch of the man later identified as defendant included distinctive items, such as a reddish-brown jacket and a diamond or crystal stickpin. O'Grady testified that defendant was wearing these items on the night of July 8, 1979.

---

[3] The gallery space was illuminated with "track" lighting.

On the night O'Grady drew the sketches, she also received a call from a musician friend, Ruby Zebra. Anthony Rogers was with O'Grady when the call occurred. Zebra advised that "Dana" was at the TraveLodge Motel at Polk and Ellis Streets with the wife of one of the murderers; according to Zebra, Dana wanted to get in touch with O'Grady. O'Grady knew a Dana Challman, who sometimes sold Opel Quaaludes. According to Rogers, Zebra advised O'Grady that the murderers' names were "Bob" and "Maurice Keenan"; Rogers then placed those names on the sketches O'Grady had done.

O'Grady relayed Zebra's tip to the police. On the morning of July 10, 1979, they went to the motel room described by Zebra. The room was abandoned, with items such as a camera left behind. While in the room, the officers received word to telephone Zebra. As a result of the subsequent call, they went to Zebra's home, where they met Challman. Challman named defendant as a suspect in the Opel murder and gave defendant's residence address. Zebra and Challman also said that defendant and his wife were planning to go to Miami.

The officers proceeded to the address given by Challman. There the manager identified photographs of defendant and his wife. The manager said the couple had left with luggage in a taxi shortly before the police arrived.

Defendant, Kelly, and defendant's wife Linda Holt were apprehended at San Francisco International Airport the same day. Defendant was carrying false identification. The suspects' luggage was taken into custody and searched under warrant. It contained the sawed-off shotgun identified as that brandished by Kelly at the gallery and the automatic pistol which, according to ballistics evidence, fired the fatal shot. There was ammunition for both weapons. Also included was a reddish-brown leather jacket, later identified by O'Grady as that worn by the robber with the handgun.

Defendant refused to participate in a physical lineup, even after a deputy public defender acting as his counsel informed him of the consequences. Rogers was unable to identify defendant's picture in a photo spread he viewed shortly after the gallery incident. However, both Rogers and O'Grady identified a different, more recent picture of defendant in photo spreads on July 11, 1979, three days after the murder. Rogers indicated that the second photo more closely depicted defendant's appearance at the time of the gallery incident.

Rogers positively identified defendant at trial. At first, O'Grady was unable to identify the robbers in the courtroom. She later did so, however,

noting that both by then looked "very different" and "more cleancut." Rogers agreed, explaining that defendant previously had hair which came over his ears, but at trial he wore glasses, was "a lot neater," and was clean-shaven.

Asked about the intruders' demeanor at the gallery, both Rogers and O'Grady indicated that Kelly was somewhat "hyper" and excited but that defendant for the most part seemed normal and in command. Rogers declared that defendant "was calm, he was giving the orders, he was in charge of everything that was happening." Both witnesses claimed they had no trouble understanding defendant's speech. O'Grady admitted she had called defendant "crazy" in early police and media interviews, but she explained she meant only that robbers who carry out threats to kill are crazy. Neither Rogers nor O'Grady saw evidence, based on their own experience, that defendant was under the influence of amphetamines.

The prosecution also introduced evidence of three nonviolent escapes by defendant from jail custody after his arrest for the Opel murder. Defendant stipulated that on July 12, 1979, he walked out of his San Francisco Municipal Court holding cell, which had been left unlocked by mistake. He was arrested a month later in Miami. On November 15, 1979, defendant, in handcuffs, bolted from a jail van which was transporting him and other detainees from the Hall of Justice to City Hall in San Francisco. He was caught when he tripped over a traffic island in the middle of Van Ness Avenue. Finally, it was stipulated that, on April 27, 1980, defendant left the Hall of Justice jail facility when his cell was unlocked during an inmate uprising. Defendant was arrested in an elevator without emerging from the building.

### B. *Defense case.*

Kelly testified in his own defense, and his recorded statement to the police was played for the jury. He admitted participation in the gallery incident and named defendant as his coparticipant and the actual killer of Opel. Kelly said the robbery attempt had been set up by Dana Challman, who told them the gallery was a drug den and that they should ask for drugs or money. Kelly confirmed most of Rogers's and O'Grady's account of events at the gallery. He explained that defendant shot Opel after the latter insisted, "I am not giving you nothing. You are going to have to shoot me."

Kelly said he participated in order to obtain money for himself and because he was afraid of defendant. While defendant had never directly threatened Kelly, Kelly was present the day before the murder when

defendant beat up and abducted their mutual acquaintance Carlos Stevenson. According to Kelly, he and defendant had regularly been taking amphetamines. Stevenson, like Kelly and defendant, was a "lightweight" drug dealer. According to Kelly, the three "did up some drugs" on July 7, 1979, at defendant's apartment. Kelly and defendant left the apartment for awhile; when they returned, defendant began hitting the sleeping Stevenson with a gun. Defendant then stripped Stevenson, accused him of working for "the man," dressed him in pajama bottoms, tied his hands, and left with him. When defendant returned a short time later, he said he had taken Stevenson "out of the box." Kelly inferred this meant defendant had killed Stevenson. The incident convinced Kelly that defendant was a violent person and that Kelly might be "next" if he did not go along on the gallery robbery.

Testifying for Kelly, Stevenson confirmed the beating and abduction. Stevenson said defendant drove him to a location where Stevenson was shot in the back and left for dead. By the time of trial, Stevenson had mostly recovered, but he was paralyzed from the neck down for six months after the shooting. In a taped police interview in August 1979, after the Opel murder, Stevenson said that during the incident of July 7, defendant had been taking drugs, made paranoid accusations, and "was completely out of his mind."

Defendant presented no evidence at the guilt trial.

## II. PENALTY TRIAL

### A. *Prosecution case.*

At the penalty phase, the prosecution presented evidence of three unrelated violent crimes as aggravating circumstances. (§ 190.3, factor (b).) These included a 1977 armed robbery, a 1979 burglary and witness intimidation, and a 1980 assault on a fellow jail inmate. Carlos Stevenson also supplemented his guilt phase testimony about the shooting incident of July 7, 1979.

1. *The 1977 robbery.* Late on the evening of January 18, 1977, a man accosted Darrell McElvane in a Tenderloin district phone booth in San Francisco. The man identified himself as a police officer and forced McElvane to a dark area at the rear of an adjacent parking lot. He then told McElvane not to panic, flashed a knife, and demanded McElvane's money. McElvane threw his wallet at the assailant. When the man reached down to pick it up, McElvane kicked him in the face and leaped over the parking lot fence, shouting for someone to call the police. The assailant remained

behind, "talking crazy" and threatening to kill McElvane with his ".357." Responding officers found defendant in a nearby bar. He fit McElvane's description of the assailant and was carrying two knives. Defendant gave a false name to the police. McElvane identified defendant at the scene, and defendant there admitted he was the man who confronted McElvane. He claimed he sought to purchase pills from McElvane and drew a knife for protection after McElvane took his money, produced no pills, and retreated to the dark area of the parking lot. When reporting the incident, McElvane also gave a false name, "G.L. West," because he "didn't want to get involved."

2. *The 1979 burglary and witness intimidation.* In the spring of 1979, John Blumenhein managed an apartment building on Van Ness Avenue in San Francisco. During the early morning hours of April 20, a tenant reported that someone was wandering through the manager's apartment, which was vacant at the time. Carrying a pistol, Blumenhein went to the apartment. There were two large holes in the entry door and the apartment had been ransacked. Defendant was on the premises. Blumenhein drew his pistol. He ordered defendant to "freeze," then directed defendant to the lobby and ordered him to lie down spread-eagled. Defendant began to comply but then said, "Oh, fuck it, man, shoot me" and walked out the front door of the building.

Blumenhein followed with the gun, ordering defendant to stop. Defendant refused; the two maneuvered around a parked car, and defendant began to approach Blumenhein. Defendant then jumped over a car hood and tried to board a bus. When Blumenhein told the driver defendant had committed a burglary, defendant told him to shut up and jumped back off the bus. The police arrived and ordered Blumenhein to drop his gun. Defendant then placed one of Blumenhein's carving knives on a car hood and was arrested.

Defendant had been evicted from the building the previous day, April 19, "probably" for nonpayment of rent. His possessions were removed from his apartment on that day. On the afternoon of April 21, the day after the burglary, defendant and Linda Holt returned to claim possessions. During an angry sidewalk confrontation, defendant said Blumenhein and his family would die if Blumenhein did not drop the burglary charges. Back inside his apartment, Blumenhein noticed his two children looking out the street window. Joining them, Blumenhein saw defendant looking directly up from the street; defendant made a throat-cutting gesture with his index finger. Defendant was subsequently convicted of burglary and intimidation of witnesses (§ 459, former § 136).

3. *The 1980 jailhouse assault.* In November 1980, Richard Mayer and defendant were inmates at the San Francisco County jail. On November 20,

during a visit by Mayer's father, defendant approached Mayer from the side, grabbed him around the neck, and stabbed him twice. One wound was near the jugular vein, a few inches below the right ear. Mayer's father described the weapon as a nine- or ten-inch piece of pointed steel, wrapped with cloth at the blunt end. The actual implement used to stab Mayer was not placed in evidence, having apparently been lost by the authorities. However, the victim's father identified People's exhibit 45, a gray metal prison "shank" displayed for "illustrative" purposes, as a similar but slightly longer object. A deputy sheriff who investigated the incident also indicated that People's exhibit 45 was similar to the weapon he recovered, but that the actual weapon was "smaller by two or three inches."

Mayer testified he had scuffled with defendant some two weeks before; both parties were injured in the fight. According to Mayer, the earlier fight had begun when defendant insulted and threatened Mayer, then reached for what defendant claimed was a "shank" in his pocket. At that point, said Mayer, "we both went off."

B. *Defense case.*

Through lay and expert witnesses, defendant presented an extensive study of his background and character, and of his mental state at the time of the Opel murder. Jean Sheppard, an acquaintance of defendant, testified that during the first half of 1979, defendant and Holt were using drugs "insanely." According to Sheppard, defendant in early July 1979 was "erratic," "paranoid," "delusional," and "manic." The day before the Opel shooting, defendant ran into Sheppard's room and discharged a gun. Defendant thought he had shot himself in the foot, but the bullet had actually gone into the ceiling.

A defense clinical psychologist, Dr. Pierce, concluded after examining defendant that he had an amphetamine dependency and a "rather severe paranoid personality disorder" which exaggerated threats of harm. Defendant gave Dr. Pierce several versions of his memory of the Opel shooting, sometimes claiming he recalled nothing. In one version, defendant professed belief that Opel had a gun and was going to shoot him. At another point, defendant said he went to "do business" with Opel, but "he guessed it didn't work and somebody got killed."

Dr. Pierce saw no defense of diminished capacity, and tests indicated that defendant was not psychotic. Dr. Pierce opined, however, that on the night of the Opel shooting, defendant was under an extreme amphetamine-induced mental and emotional disturbance. This condition enhanced his paranoid tendencies, impaired his capacity to appreciate the wrongfulness of

homicidal conduct, and inhibited his ability to control homicidal impulses. Similar views were expressed by a defense psychiatrist, Dr. Benson. Dr. Benson conceded that defendant's order to kill Rogers and O'Grady as witnesses was not "impulsive."

Witnesses familiar with defendant's childhood described a history of stuttering, clumsiness, low academic achievement, and family upsets. His sister said his personality changed, and his drug use increased, after he left home and went to the Haight-Ashbury for a year at the age of 14. Christopher Cunningham, a family marriage counselor, studied the Keenan family for the defense. He described it as isolated, rejecting, and noncommunicative, with a punitive mother and an overachieving, mostly absent father. In Cunningham's view, an overriding need for the appearance of normality kept problems hidden. Cunningham reported that when defendant ran away to the Haight-Ashbury, no effort was made to find him. Defendant's father described defendant to Cunningham as "too dumb to come in out of the rain."

Dell Sokol, an educational psychologist, concluded that defendant had an average IQ but suffered learning disabilities, a condition found to some degree in 10 percent of school children. Defendant's reading comprehension was at the fourth grade level. His motor skills were below normal, and he had a sharply reduced ability to discriminate between similar sounds. Dr. Pierce agreed that defendant had normal intelligence, noting that he scored in the superior range on logical and abstract reasoning and long-term visual memory and alertness. According to Dr. Pierce, reports that defendant gloated over the Opel shooting indicated a person who was either very mean or very emotionally disturbed.

Both Dr. Pierce and Dr. Benson found some evidence of "minimal brain dysfunction." Dr. Benson opined that defendant's excessive amphetamine use might indicate an instinctive effort to self-medicate this condition.

Dr. Benson took an extensive history of defendant. According to Dr. Benson, defendant's maternal grandmother was psychotic, his maternal grandfather an alcoholic. His mother's low frustration tolerance led to extreme difficulty in handling defendant. Defendant was a "breech" baby, which "may" have reduced oxygen flow to his brain at birth. At age five, defendant had speech and reading difficulties and may have been dyslexic. Behavior problems began at age eight. At age 11 there was a seizure which may have been epileptic. Between ages 10 and 14, defendant ran away frequently and was suspected of vandalizing a community center where he had attended kindergarten. At age 12, defendant stole and wrecked the family car.

Between ages 15 and 17, defendant continued to run away and commit petty thefts. He was sent to the California Youth Authority (CYA). A doctor at CYA treated defendant with tranquilizers for a thought disorder. Defendant was described during his stay at CYA as guarded, isolated, impulsive, and lacking in drive, judgment, and control. Later at San Quentin, defendant was treated for a seizure disorder.

On cross-examination of defense experts, the prosecutor elicited evidence concerning defendant's ability to adjust to life imprisonment. The defense presented further affirmative evidence on this score. Dr. Benson conceded that defendant's escapes from custody indicated a dislike for confinement. On the other hand, Susan Cherry, a counselor for the Department of Corrections, found defendant a good candidate for prison adjustment. She worked with defendant for eight months in 1981 and 1982; he was intelligent, articulate, and anxious to involve himself in prison activities. He gave no trouble. Cherry said life inmates tend to be stable elements of the prison population, since they know they will never leave.

The defense also called Dr. Haney, an associate professor of psychology and an attorney. Dr. Haney also found defendant a good confinement risk. In Dr. Haney's view, defendant had matured after past periods of turmoil, accepted his lifelong confinement, and appeared motivated to participate in constructive activities. Neither the 1980 jail assault nor the several escapes altered Dr. Haney's view. He acknowledged the stress created by crowded cell conditions at San Quentin.

### C. *Rebuttal.*

Carlos Stevenson testified on rebuttal that during mid-1979, defendant was consuming substantially smaller quantities of amphetamines than reported by other witnesses. When defendant shot Stevenson, he remarked that "they will never prosecute because we are out of our minds on drugs." Stevenson reaffirmed that the shooting incident was "strange" in light of his past friendship with defendant, and that he did not feel defendant knew what he was doing.

### III. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

Defendant raises only two claims of error at the guilt phase of his trial, and two other issues as to the special circumstance findings. We conclude, however, that no prejudicial error occurred. Accordingly, we will affirm the convictions and the special circumstance findings.

## A. *Joint trials.*

Defendant's principal guilt phase contention is that his trial should have been severed from that of his codefendant, Kelly. Prior to trial, defendant twice moved for severance. He cited the codefendants' possible antagonistic defenses and also urged that he would be improperly prejudiced by introduction *against Kelly* of Kelly's taped confession implicating defendant. (See *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265].) To the second of his pretrial motions, defendant attached the entire text of the Kelly statement. The prosecution ultimately stated it would not use the Kelly tape. However, Kelly's counsel indicated *he* intended to introduce it as "state of mind" evidence to corroborate Kelly's defense of duress and menace. In this posture, the pretrial motions were denied without prejudice.

During jury selection, Kelly's counsel advised that he wished to introduce evidence (1) of defendant's shooting of Stevenson on July 7, 1979, and (2) that Kelly was aware of the Stevenson incident when he agreed to participate in the July 8 gallery robbery. Defendant renewed his severance motion, noting that Kelly's testimony about the Stevenson matter was "enormously prejudicial" to defendant and would not be admissible against him if he were tried separately. Defendant's counsel also pointed out that Kelly could presumably call Stevenson himself, as well as any other witness to the shooting. The trial court denied the renewed motion.

As promised, the prosecution did not introduce the Kelly tape in its case in chief. Kelly testified in his own behalf, describing his involvement in the Stevenson episode, and he introduced the tape.[4] Stevenson was called by Kelly and testified, as noted, that defendant shot him and left him for dead on July 7, 1979.

■ Defendant renews his contention that the Stevenson incident was manifestly harmful to his defense but could not have been admitted against him in a separate trial. He therefore contends the trial court prejudicially abused its discretion in denying severance. We disagree.

The Penal Code states a general preference for joint trial of jointly charged defendants. (§ 1098.) A "classic" case for joint trial is presented

---

[4] When Kelly offered the tape in evidence, defendant's counsel conceded that Kelly's testimony in his own behalf eliminated any *Aranda* problem, and defendant pursues no *Aranda* claim on appeal. Though alluding again to the problem of joint trials, defendant's counsel also acknowledged to the trial court that the tape was relevant to Kelly's defense and could not be excluded. The trial court offered defendant the opportunity to object to admission of any specific parts of the tape. There is no indication that counsel did so.

when defendants are charged with common crimes involving common events and victims. (*People* v. *Turner* (1984) 37 Cal.3d 302, 312-313 [208 Cal.Rptr. 196, 690 P.2d 669].) Severance remains largely within the discretion of the trial court. (§ 1098; *Turner, supra,* at p. 312.) This court has said that severance should generally be granted "in the face of an incriminating confession [by a codefendant], prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*Turner, supra,* at p. 312; *People* v. *Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869] [fns. omitted].)

However, we recently cautioned that a joint trial is not unfair simply because the codefendants "have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution. [Citations.]" (*Turner, supra,* 37 Cal.3d at p. 313.) If the likelihood of antagonistic testimony alone required separate trials, they "would appear to be mandatory in almost every case." (*Id.,* at pp. 312-313.)[5]

Defendant urges, however, that Kelly did not simply seek to exculpate himself by laying blame on defendant. Rather, his "antagonistic defense" of duress or menace allowed him to present prejudicial evidence and argument of *uncharged conduct by defendant,* which would not have been admissible against defendant in a separate trial. Assuming this is a valid ground for distinguishing the reasoning of *Turner, supra,* we nonetheless conclude the trial court acted within its discretion in denying the severance motion.

Recent decisions addressing the analogous problem of severance of *counts* (see § 954) are instructive. ■ When ruling on a motion to sever counts for which the statute allows joint trial, the court must decide whether the realistic benefits from a consolidated trial are outweighed by the likelihood of "substantial" prejudice to defendant.

In determining the degree of potential prejudice, the court should evaluate whether (1) consolidation may cause introduction of damaging evidence not admissible in a separate trial, (2) any such otherwise-inadmissible evidence is unduly inflammatory, and (3) the otherwise-inadmissible evidence would have the effect of bolstering an otherwise weak case or cases. Severance motions in capital cases should receive heightened scrutiny for potential prejudice. (*People* v. *Smallwood* (1986) 42 Cal.3d 415, 426-429 [228

---

[5] Defendant suggests that severance was required because, among other reasons, it is likely Kelly would have exercised his Fifth Amendment privilege not to testify against defendant in a separate trial. We are aware of no principle which gives defendant the right to insulate himself, by the tactical device of severance, from the *relevant and admissible* testimony of his codefendant.

Cal.Rptr. 913, 722 P.2d 197]; *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 448-454 [204 Cal.Rptr. 700, 683 P.2d 699].) The balancing process is a "highly individualized exercise" (*Williams* v. *Superior Court, supra,* at p. 452), and the propriety of a trial court ruling depends on the facts *as they appeared when the motion was decided.* (*Turner, supra,* 37 Cal.3d at p. 312.)

Here, such a balance hardly required severance. Defendant insists that the prosecutor never asserted any benefits from a joint trial. However, judicial economy was obviously paramount in this case, since separate trials would have required selection of two juries, one death-qualified, and presentation of much the same evidence and witnesses to each.[6] Defendant demonstrated no potential prejudice sufficiently "substantial" to justify this duplication of resources even in the context of a capital case.

We assume arguendo, as defendant suggests, that the Stevenson shooting, and certain other evidence presented by Kelly which suggested defendant's violent nature, would have been inadmissible in his separate guilt trial for the Opel murder. Defendant urges that, apart from its usefulness to Kelly, such evidence merely suggested defendant's criminal propensity and did not go directly to such issues as identity or intent. (See Evid. Code, §§ 1101, 1102; see also, e.g., *People* v. *Thompson* (1980) 27 Cal.3d 303, 314-321 [165 Cal.Rptr. 289, 611 P.2d 883].)

"Other crimes" evidence which would not be admissible against an accused in his separate trial holds a well-understood potential for prejudice. However, the likelihood of its admission in an otherwise proper joint trial does not alone justify severance. (*Smallwood, supra,* 42 Cal.3d at p. 429.) Further, we are persuaded, severance was not required in this case on grounds that such evidence was potentially "inflammatory."[7]

Here, we conclude, any potential prejudice from the disputed evidence was minimal, since it was unlikely to alter the verdict by unfairly bolstering an otherwise weak case. At the time the motions to sever were decided, the clearly admissible evidence that defendant was guilty of all the charges against him was already very strong.

---

[6] Jury selection in this case consumed 13 court days, and presentation of guilt phase evidence consumed 5 court days. These specific facts were not known to the trial court when it ruled on the severance motions (though the final denial came in the midst of the jury selection process). However, the court was entitled to make realistic estimates of the likely effect of severance on judicial resources.

[7] Among other things, defendant complains that the joint trial permitted introduction of Kelly's inflammatory comment that defendant "kind of gloated" about the Opel shooting. Defendant does not argue that this evidence was inadmissible in Kelly's defense. Insofar as it was merely "antagonistic" evidence about the *gallery incident itself, Turner, supra,* teaches that it did not justify severance.

At the preliminary hearing, eyewitnesses Rogers and O'Grady positively identified defendant as a coparticipant in the gallery incident. While both witnesses conceded at the hearing that Kelly and defendant were obscured from their view at the moment Opel was shot, they made clear that defendant was the robber brandishing a handgun of the kind which killed Opel. They also suggested that defendant had been confronting Opel directly, while Kelly, at defendant's direction, took responsibility for the two surviving victims. As at trial, the witnesses said that shortly before Opel was shot, they saw defendant fire the handgun at the ceiling during an argument with Opel. After a subsequent shot which sounded like it came from the same gun, they heard Opel's body fall. Rogers identified as similar to the robbers' weapons a handgun and shotgun found in luggage carried by defendant, Holt, and Kelly at the time of their airport arrest two days after the killing.

Under these circumstances, the trial court could properly conclude that the benefits of joinder outweighed any potential prejudice to defendant arising from Kelly's "duress" defense. The court did not abuse its discretion in denying the motion for severance.

Even if we concluded the contrary, however, reversal would not be warranted. Hindsight reveals that defendant suffered no actual prejudice from admission of the Stevenson evidence. (See *Turner, supra,* 37 Cal.3d at p. 312.) In his opening argument at trial, defense counsel conceded that defendant had personally shot and killed Opel. The prosecutor did not introduce Kelly's taped statement. Rogers and O'Grady described the gallery incident essentially as they had at the preliminary hearing. Though they noted intervening changes in appearance, the witnesses again named defendant and Kelly as the participants and implicated defendant as Opel's killer. They acknowledged they had easily picked defendant from a photo lineup in which he was depicted as he appeared at the gallery.

Ballistics evidence not presented at the preliminary hearing linked the handgun found in the suspects' luggage with the bullet removed from Opel's head. Rogers and O'Grady again identified weapons taken from the suspects at the airport, and O'Grady recognized defendant's distinctive leather jacket. The trial included evidence of defendant's multiple escapes from custody, implying his consciousness of guilt. Defendant presented no evidence whatever in his own behalf.[8]

---

[8] In view of the very strong circumstantial evidence, and the eyewitnesses' ability to identify the weapon and clothing displayed by defendant, there is no merit to his contention that the Kelly testimony precluded a potentially successful "mistaken eyewitness" strategy. Of course, to the extent Kelly merely corroborated defendant's identity as a coparticipant, his testimony was admissible, and severance was not justified merely on grounds this damaging evidence might not have been introduced in defendant's separate trial. (See *Turner, supra,* 37

Under the circumstances, there is no reasonable probability that the verdict as to defendant was affected by Kelly's defense in their joint trial. Hence, there is no basis for reversal. (*Massie, supra,* 66 Cal.2d at pp. 922-923; *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

B. *Death qualification as leading to unrepresentative and guilt-prone jury.*

Defendant objects to the elimination from his guilt phase jury of persons who, though unable to vote for the death penalty, stated they could be fair on the issue of guilt. He urges that the resulting panel was guilt-prone and unrepresentative of the community. We have consistently rejected such contentions, and the United States Supreme Court has vindicated our view. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-184 [90 L.Ed.2d 137, 147-155, 106 S.Ct. 1758]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 79-80 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680] [plur. opn.], 374-375 [conc. opn. of Kaus, J.]; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 61-69 [168 Cal.Rptr. 128, 616 P.2d 1301].) No reason appears to reconsider the issue here.

C. *Intent to kill as element of felony-murder special circumstances.*

The trial court failed to instruct the jury that in order to find the special circumstance allegations true, it must determine that defendant specifically intended to kill Opel. Defendant asserts this was error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].

However, we have overruled *Carlos's* holding that the 1978 death penalty law imposes an intent-to-kill requirement on all felony-murder special circumstances. Under current law, intent to kill need be charged and proved only where the defendant was an aider and abetter, and not the actual killer. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306].) Here, as noted, defense counsel conceded that defendant personally inflicted the fatal wound on Opel, and there was no substantial evidence to the contrary. Hence, there was no duty to instruct on the intent-to-kill issue. (*Id.,* at pp. 1147-1148, citing *People* v. *Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1]; see also *People* v. *Poggi* (1988) 45

---

Cal.3d at pp. 312-313, and discussion *ante.*) *There is no suggestion* that Kelly's defense, or the Stevenson incident in particular, undermined a potential *diminished capacity* claim on defendant's behalf. No such defense was presented, despite extensive evidence of defendant's habitual drug use, and the State Public Defender's exhaustively thorough briefs raise no claim of ineffective assistance on that score. This may be because of the views of defendant's own experts, alluded to at the penalty phase, that he was *not* suffering from diminished capacity when he fired the fatal shot.

Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082] [*Anderson* applies retroactively].)

For similar reasons, no intent-to-kill finding was necessary to satisfy the Eighth Amendment. ■ After proper consideration of the individual circumstances, the death penalty may constitutionally be imposed on one who "*actually* killed, attempted to kill, *or* intended to kill. . . ." (*Tison* v. *Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139, 107 S.Ct. 1676], italics added, construing *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].)

Here, the first degree murder verdict against defendant was premised solely on felony-murder instructions, and the jury made no express or implied finding that defendant personally killed Opel. However, assuming an adequate record, such a finding may be made by either a trial or appellate court at any time prior to execution. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 383-388 [88 L.Ed.2d 704, 714-718, 106 S.Ct. 689].) Accordingly, on overwhelming evidence, we find that defendant was Opel's actual killer, thus satisfying any Eighth Amendment concern.[9]

D. *Denial of discovery re arbitrary charging of special circumstances.*

Before trial, defendant sought extensive discovery about the capital-charging policies and practices of the San Francisco District Attorney's office, as applied in all cases handled by that office which met certain potentially capital criteria. Defendant's purpose was to obtain information allowing a challenge to the constitutionality of the special circumstance allegations against him on two grounds: (1) that the district attorney had no standards for deciding whether to charge special circumstances in an eligible case, and (2) that the prosecution was arbitrarily alleging special circumstances in this case.

As grounds for the request, defendant's counsel declared (1) that special circumstances were not alleged against defendant until the third complaint was filed against him, (2) that Kelly, the codefendant, was not capitally charged, (3) on information and belief, that in other cases involving murder, burglary, and robbery, the district attorney had not alleged special circumstances, and (4) that so far as counsel was aware, the district attorney had

---

[9] The evidence also overwhelmingly supports alternative findings on our part that defendant killed Opel intentionally, or was a major participant, with reckless indifference to life, in a felony leading to death. Such maliciously reckless participation in a deadly felony is a fourth kind of culpability for which the Eighth Amendment permits execution. (See *Tison, supra,* 481 U.S. at pp. 157-158 [95 L.Ed.2d at pp. 144-145].)

no formal or informal standards for the exercise of prosecutorial discretion in this regard.

The trial court denied the request for discovery, and defendant filed a petition for mandate in the Court of Appeal. There, his claim was rejected in a published opinion. (*Keenan* v. *Superior Court* (1981) 126 Cal.App.3d 576 [177 Cal.Rptr. 841] (*Keenan I*).) That holding became law of the case. (*People* v. *Medina* (1972) 6 Cal.3d 484, 491, fn. 7 [99 Cal.Rptr. 630, 492 P.2d 686].)

Defendant nonetheless renews his objection to the denial of discovery. He urges that application of the law-of-the-case doctrine would create "unjust results" (see *People* v. *Shuey* (1975) 13 Cal.3d 835, 845 [120 Cal.Rptr. 83, 533 P.2d 211]) since (1) this court has exclusive jurisdiction over capital issues, (2) *Keenan I* manifestly misapplied existing principles and failed to address all the issues, and (3) our attention to the problem of standardless charging discretion is required.

None of these assertions is persuasive. *Keenan I* was correctly decided by a court with subject matter jurisdiction. ■ As the opinion noted, prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment. (*Jurek* v. *Texas* (1976) 428 U.S. 262, 274 [plur. opn.], 279 [conc. opn. of White, J.] [49 L.Ed.2d 929, 939-940, 942, 96 S.Ct. 2950]; *Proffitt* v. *Florida* (1976) 428 U.S. 242, 254 [plur. opn.], 261 [conc. opn. of White, J.] [49 L.Ed.2d 913, 924, 927-928, 96 S.Ct. 2960]; *Gregg* v. *Georgia* (1976) 428 U.S. 153, 199-200 [plur. opn.], 225-226 [conc. opn. of White, J.] [49 L.Ed.2d 859, 889-890, 903-904, 96 S.Ct. 2909]; see *McClesky* v. *Kemp* (1987) 481 U.S. 279, 292 [95 L.Ed.2d 262, 278, 291, 107 S.Ct. 1756]; see also cases cited in *Keenan I,* 126 Cal.App.3d at p. 584.[10])

---

[10] Since *Keenan I* was decided, additional states have concluded that prosecutorial discretion in pursuing capital charges does not violate the United States Constitution. (E.g., *Correll* v. *Com.* (1987) 232 Va. 454 [352 S.E.2d 352, 353-354], cert. den. 482 U.S. 931 [96 L.Ed.2d 705, 107 S.Ct. 3219]; *State* v. *Noland* (1984) 312 N.C. 1 [320 S.E.2d 642, 649-650], cert. den. (1985) 469 U.S. 1230 [84 L.Ed.2d 369, 105 S.Ct. 1232]; *State* v. *Jenkins* (1984) 15 Ohio St.3d 164 [473 N.E.2d 264, 273-274], cert. den. (1985) 472 U.S. 1032 [87 L.Ed.2d 643, 105 S.Ct. 3514]; *Engberg* v. *State* (Wyo. 1984) 686 P.2d 541, 555, cert. den. 469 U.S. 1077 [83 L.Ed.2d 516, 105 S.Ct. 577]; *State* v. *Rupe* (1984) 101 Wn.2d 664 [683 P.2d 571, 592-593]; *Williams* v. *State* (Ind. 1982) 430 N.E.2d 759, 763, app.dism. 459 U.S. 808 [74 L.Ed.2d 47, 103 S.Ct. 33]; see *Calhoun* v. *State* (1983) 297 Md. 563 [468 A.2d 45, 63-64], cert. den. *sub nom. Tichnell* v. *Maryland* (1984) 466 U.S. 993 [80 L.Ed.2d 846, 104 S.Ct. 2374]; *State* v. *Bolder* (Mo. 1982) 635 S.W.2d 673, 685, cert. den. (1983) 459 U.S. 1137 [74 L.Ed.2d 983, 103 S.Ct. 770]; *Edwards* v. *State* (Miss. 1982) 413 So.2d 1007, 1012, cert. den. 459 U.S. 928 [74 L.Ed. 188, 103 S.Ct. 239].)

Many circumstances may affect the litigation of a case chargeable under the death penalty law. These include factual nuances, strength of evidence, and, in particular, the broad discretion to show leniency. Hence, one sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially similar did not receive the death penalty. (*McClesky, supra,* 481 U.S. at pp. 307-308, and fn. 28 [95 L.Ed.2d at p. 288]; *Pulley* v. *Harris* (1984) 465 U.S. 37, 50-51 [79 L.Ed.2d 29, 40-41, 104 S.Ct. 871].) The same reasoning applies to the prosecutor's decisions to pursue or withhold capital charges at the outset.

■ Defendant implies that prosecutors must develop fair "standards" for deciding when to seek the death penalty. But this contention undermines the basic premise of *Gregg, Proffitt, Jurek,* and *McClesky,* all *supra,* that the requisite "standards" are those minimum standards set forth in a constitutional death penalty statute. By acceptably narrowing the circumstances under which capital punishment may be sought and imposed, such a law satisfies the constitutional prohibition against arbitrary and capricious exaction of the death penalty.

When he acts under such a law, and "[a]bsent a persuasive showing to the contrary, we must presume that the district attorney's decisions were legitimately founded on the complex considerations necessary for the effective and efficient administration of law enforcement. [Citation.]" (*People* v. *Haskett* (1982) 30 Cal.3d 841, 860 [180 Cal.Rptr. 640, 640 P.2d 776].) To require prosecutors to justify each capital-charging decision by reference to others would "plac[e] totally unrealistic conditions" on the use of capital punishment. (*Gregg, supra,* 428 U.S. at p. 199, fn. 50 [49 L.Ed.2d at p. 889]; see *McClesky, supra,* 481 U.S. at p. 296, and fn. 17 [95 L.Ed.2d at p. 281].)

■ Of course, an accused may show by direct or circumstantial evidence that prosecutorial discretion was exercised with *intentional and invidious discrimination in his case. (Oyler* v. *Boles* (1962) 368 U.S. 448, 456 [7 L.Ed.2d 446, 452-453, 82 S.Ct. 501]; *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293-301 [124 Cal.Rptr. 204, 540 P.2d 44]; see *McClesky, supra,* 481 U.S. at pp. 292-298 [95 L.Ed.2d at pp. 278-282].) In theory, he may also show a "constitutionally unacceptable" risk that an irrelevant and invidious consideration is systematically affecting the application of a facially valid capital-sentencing scheme. (*McClesky, supra,* 481 U.S. at pp. 299-319 [95 L.Ed.2d at pp. 283-296].) In light of the substantial discretion properly allowed decisionmakers in the capital-sentencing process, however, any statistical or comparative evidence presented for these purposes must demonstrate a "significant," "stark," and "exceptionally clear" pattern of invidious discrimination. (*Id.,* at pp. 293-297 [95 L.Ed.2d at pp. 279-281, 283-296].)

As *Keenan I* observed, however, defendant made no allegation of purposeful, invidious discrimination here. ■ He merely asserted that capital charging by the San Francisco District Attorney's office appeared to be "standardless," that capital charges against him were delayed, and that he sustained harsher charges than others whose crimes he deemed similar. These claims are patently insufficient to raise the issue of individual or systematic discrimination on invidious grounds.[11] Hence, they constituted no "plausible justification" for granting defendant's extensive discovery request, in whole or in part. (See *Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300, 306-307 [142 Cal.Rptr. 286, 571 P.2d 997].) *Keenan I* reached the proper result, and the trial court properly denied defendant's application for discovery.[12]

Defendant makes no other assertions of error at the guilt and special circumstance phase of his trial. We therefore affirm all the convictions and special circumstance findings.

## IV. PENALTY ISSUES

Defendant asserts that several errors were committed at the penalty phase of his trial. We conclude that where technical error occurred, there was no prejudice warranting reversal of the penalty judgment. We address defendant's contentions in turn.

### A. *Ramos error.*

Prison counselor Cherry, called by the defense, had testified that life inmates tend to be stable elements of the prison population because they know they will not be leaving the institution. On cross-examination, the following colloquy occurred: "BY MR. MURRAY [the prosecutor]: Q. On what do you base your opinions, Ms. Cherry, that lifers will never be going home, that they will never leave there? [¶] A. I didn't say all. [¶] Q. You said most. [¶] A. Um-hum. [¶] Q. On what do you base that? [¶] A. On the law as it is now written. [¶] Q. And what is that law? [¶] A. Well, it depends

---

[11] Defendant's claim that differences in treatment between himself and his codefendant demonstrate discrimination is particularly specious. As noted, the evidence before the prosecutor indicated that defendant was the triggerman in the Opel murder, the dominant party in the robbery attempt, and the owner of a substantial prior felony record. By contrast, codefendant Kelly refused defendant's orders to kill the remaining witnesses, had asserted his fear of defendant, and had no prior record.

[12] Defendant urges that *Keenan I* failed to deal expressly with his *state* constitutional claims; that assertion is wrong. (See *Keenan I,* 126 Cal.App.3d at p. 585.) In any event, we conclude that the reasoning set forth in *Keenan I* and in the text above applies equally to the federal and state Constitutions.

on how they are sentenced, Mr. Murray. [¶] Q. Yes, it does. Does the law also include authority of the Governor of the State of California—."

At this point, defense counsel interrupted. His objection to the question was immediately sustained, and the court admonished the jury to "disregard the last question asked by the prosecutor."

Defendant urges, and the People concede, that the prosecutor's reference to the Governor's power to commute a life sentence was improper under our state Constitution. (See *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430]; but see *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446] [finding no federal constitutional error].) ■ However, while *People* v. *Ramos, supra,* makes an instructional reference to the commutation power reversible per se, a similar result does not necessarily follow from isolated references by the *prosecutor.*

As in *People* v. *Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], we conclude that no serious *Ramos* error occurred here. The prosecutor's remark was "brief and isolated" (*Ghent, supra,* at p. 770), and the jury was promptly admonished to ignore it. Under these circumstances, the misconduct was harmless by any standard.[13]

### B. *Remorse.*

During closing argument, the prosecutor remarked: "Are there any other factors that might assist you in evaluating, *in terms of aggravation,* the defendant? [¶] I think there is a significant factor. That is, members of the jury, that throughout the testimony that was presented by the defense, all of those interviews with the defendant that were related to us in significant part, never once was there any suggestion of an expression of remorse—."

At this point, defense counsel objected, declaring that "[i]f Mr. Murray [the prosecutor] wanted to find out of [*sic*] Mr. Keenan ever expressed

---

[13] In his supplemental brief, defendant stresses the factual differences between *Ghent* and this case; in *Ghent,* the improper remark occurred during voir dire, before the jury's "attention was 'narrowly focused' on the two alternative punishments awaiting its selection" (43 Cal.3d at p. 770, quoting *Ramos, supra,* 37 Cal.3d at p. 153), and this trial, unlike Ghent's, occurred *after* our initial decision condemning instructional reference to the commutation power (*Ghent, supra,* 43 Cal.3d at p. 770; see *People* v. *Ramos* (1982) 30 Cal.3d 553, 590-602 [180 Cal.Rptr. 266, 639 P.2d 908], reversed *sub nom. California* v. *Ramos, supra,* 463 U.S. 992). On the other hand, *Ghent* itself implied that an admonition to the jury, which Ghent did not seek, may avert any harm caused by an improper reference to the commutation power. (43 Cal.3d at p. 770.) In light of the trial court's unequivocal warning here, we cannot conclude that the prosecutor's brief comment, occurring in the midst of testimony and well before instructions and final argument began, held a realistic potential for prejudice.

remorse, he should have asked the witness and he should have found out. . . . [¶] . . . I think that's not an aggravating factor, according to the statute. It's also improper argument. Misconduct."

The trial court sustained the objection. Noting that "both counsel are given considerable latitude in interpreting the evidence for you," the court declined to find misconduct on the prosecutor's part. However, it admonished the jury "not [to] speculate as to evidence that has not been presented to you," and that "[y]ou must decide the case only on the evidence that you've heard here." The court did not warn that absence of remorse is not an aggravating factor.

Without objection, the prosecutor went on to argue that "the record does reflect some things [about lack of remorse], doesn't it . . .?" In particular, he noted Kelly's testimony and taped statement that defendant "kind of gloated" over the gallery incident and "kind of liked watching the blood gush from the head of Robert Opel. That's in the record."

■ Defendant urges that these comments violated his privilege against self-incrimination, since they called the jury's attention to his failure to testify and focused on his failure to confess. (See *Griffin* v. *California* (1965) 380 U.S. 609, 613-615 [14 L.Ed.2d 106, 109-110, 85 S.Ct. 1229]; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248].) However, the prosecutor did not refer to defendant's failure in either respect. He carefully pointed only to affirmative evidence that remorse was lacking, and to omissions from "testimony" and psychiatric "interviews" which *were* "presented by the defense." (See *Ghent, supra,* 43 Cal.3d at p. 771.) Moreover, the trial court immediately warned the jury not to draw inferences from absent evidence. There was no reversible *Griffin-Coleman* error.

■ Defendant next urges that the prosecutor acted in bad faith to mislead the jury, since he knew of facts which suggested defendant's remorse. Through pretrial motions, defendant observes, the prosecutor was aware that defendant had written Opel's sister a note expressing regret for the killing. Defendant had also moved to limit cross-examination, if he took the stand, to his testimony that he did shoot Opel, "is very sorry," and "regrets it very much."

In general, however, the prosecutor may comment on the record as it actually stands. The record contains no explanation why defendant did not present any "remorse" note as mitigating evidence. Further, defendant chose not to take the stand and express his remorse after a proper trial court ruling deferring his motion to limit cross-examination. (See discussion *post.*)

The trial court expressly admonished the jury not to speculate on absent evidence. Defendant never objected to the *admissibility or relevance* of Kelly's testimony that defendant "gloated"; this was affirmative evidence of lack of remorse. Under the circumstances, we find no misconduct of the sort defendant suggests.[14]

■ Finally, defendant urges it was improper for the prosecutor to argue that the evidence demonstrated lack of remorse and that absence of remorse is a factor *in aggravation*. Aggravating factors under the 1978 death penalty law are limited to those expressly set forth in the statute. (*People v. Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782].) Lack of remorse is not included in the statutory list. (See § 190.3, factors (a)-(k).) The prosecutor may suggest that evidence of remorselessness, or an absence of evidence of remorse, weighs against the finding of remorse as a *mitigating* factor. (*Ghent, supra,* 43 Cal.3d at p. 771; see also *People v. Odle* (1988) 45 Cal.3d 386, 422 [247 Cal.Rptr. 137, 754 P.2d 184]; *People v. Ruiz* (1988) 44 Cal.3d 589, 622 [244 Cal.Rptr. 200, 749 P.2d 854].) On the other hand, he should not argue that the absence of remorse is a factor *in aggravation*. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 788-790 [230 Cal.Rptr. 667, 726 P.2d 113]; *People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861] [plur. opn.].)

However, we find no prejudice from the prosecutor's remarks. As we have suggested, remorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told. (*People v. Williams* (1988) 44 Cal.3d 883, 966 [245 Cal.Rptr. 336, 751 P.2d 395] (*Keith Daniel Williams*); see *Ghent, supra,* 43 Cal.3d at p. 771.)

Moreover, as we conclude below, the jury was not misled about the pertinent evidence or the nature of its penalty responsibilities. The instructions and argument made clear that the jury was to decide which penalty it deemed appropriate under all the relevant evidence about the offense and offender. The jury was also instructed to be guided by specified sentencing factors as "applicable;" neither remorse nor the lack thereof was included in the list. Under the circumstances, we see no reasonable possibility that the

---

[14] Because the record contained positive evidence of lack of remorse, of which defendant was well aware, and the jury was admonished not to speculate on evidence not in the record, there is no merit in his claim that his sentence was unconstitutional because rooted in unrebuttable, nonrecord inferences that he lacked remorse. (Citing *Booth v. Maryland* (1987) 482 U.S. 496, 506-507 [96 L.Ed.2d 440, 450-451, 107 S.Ct. 2529]; *California v. Brown* (1987) 479 U.S. 538, 543 [93 L.Ed.2d 934, 941, 107 S.Ct. 837]; *Elswick v. Holland* (S.D.W.Va. 1985) 623 F.Supp. 498, 504.)

prosecutor's "remorse" argument affected the jury's sentencing discretion. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306].)

C. *Allocution.*

Prior to commencement of the penalty phase, defendant moved for permission "briefly to address the jury in what has come to be known as the right of allocution." He offered to reveal in camera what he would say in his statement. The trial court denied the motion without hearing the proffered declaration. The court ruled that while defendant could testify, he would not be allowed before the jury to make a sworn or unsworn statement immune from cross-examination. Defendant would, however, be permitted to address the court at the postverdict sentence hearing. (§ 190.4, subd. (e).)

Defendant urges that denial of his request violated a constitutional right to allocution or, in the alternative, constituted an abuse of discretion. We rejected a similar argument in *People* v. *Robbins* (1988) 45 Cal.3d 867, 888-890 [248 Cal.Rptr. 172, 755 P.2d 355]. We acknowledged federal authority suggesting such a constitutional right in noncapital cases. We observed, however, that California law grants a capital defendant the right to *present evidence and testify* in his own behalf on the issue of penalty. ". . . Given this, we fail to see the need, much less a constitutional requirement, for a corresponding 'right to address the sentencer without being subject to cross-examination' in capital cases." (P. 889.) Nor, we concluded, had Robbins shown that such a right is guaranteed by the common law of this state. (Pp. 889-890, comparing *Harris* v. *State* (1986) 306 Md. 344 [509 A.2d 120, 124-127] [capital case].) Similar considerations apply here.

Robbins made no offer of proof of his intended statement to the jury, and we found that fact "significantly" prejudicial to his claim. (45 Cal.3d at p. 890, comparing *Harris, supra,* 509 A.2d at p. 127.) The instant defendant did make such an offer. The distinction is not dispositive. ▮ *Robbins* is persuasive that the right of allocution is unavailable in California capital penalty trials. Its principal purpose in such cases would be to cloak defendant's right to testify with a unique immunity from examination by the People. Recognition of a right to allocution is unnecessary to a fair trial and runs counter to the statute's purpose of providing the sentencer with all relevant information bearing on the appropriate penalty. As in *Robbins,* we reject defendant's claim.

D. *Motion to limit cross-examination.*

▮ In a related contention, defendant urges the trial court improperly denied his motion to *limit* cross-examination should he decide to testify. Under the circumstances, we see no error.

During presentation of defendant's penalty case, he moved for an order limiting his cross-examination. Counsel indicated that, if called, defendant would acknowledge he shot Carlos Stevenson and Robert Opel and went to the gallery intending to rob it. Though his memory of each incident was vague, he would indicate he regretted his actions "very much." He would also testify that he wished to live. Counsel asked for an advance ruling that cross-examination be limited to the "specifics of the incident in which [defendant] shot Mr. Stevenson and his relationship with Mr. Stevenson and the specifics of the incident during which he shot Mr. Opel, and questions perhaps as to why he wishes to live." Counsel also conceded that defendant could be impeached with prior felonies. Defendant would not testify, said counsel, unless he obtained the limiting order he sought.

The prosecutor objected to an advance ruling. He declared he proposed to subject defendant to "full, complete, and extensive cross-examination . . . with respect to all aspects of this case and the defendant's background" within the limits of the Evidence Code.

In response, the trial court indicated its belief that, except for matters deemed too remote or prejudicial under Evidence Code section 352, or those already excluded for other reasons, the prosecutor was entitled to wide-ranging cross-examination. First, the court noted, defendant could be examined on all matters pertinent to his direct testimony, including his claims of remorse and vague memory. Such examination, the court suggested, might include broad inquiry into his prior criminal history and other witnesses' statements about his use of drugs near the time of the Opel and Stevenson incidents.

Moreover, in the court's tentative opinion, *"anything* that is *in the record right now* as far as—either from the prosecution side of the case or from the defense side of the case, *anything that the jury is going to be instructed they can consider in determining the penalty,* I think the prosecutor is entitled to either have that information confirmed by Mr. Keenan while he is on the stand and say, yes, I did this, or yes, I agree with Mr. X's testimony, or to deny it and say that isn't true." (Italics added.)

However, the court declined to "rule in a vacuum, because I don't know what Mr. Murray [the prosecutor] wants to bring out and I don't know enough about Mr. Keenan at this time other than what I have heard to really tell you whether it would be proper cross-examination or improper cross-examination. . . ." The court indicated it would entertain objections to specific questions if defendant decided to testify.

Defendant urges the trial court erred in implying that he could be cross-examined on all record matters pertinent to penalty, whether or not they

arose in his direct testimony. Thus, he contends, the court improperly denied his request to limit his cross-examination. The ruling prejudiced him, he asserts, by forcing him to avoid presenting his mitigating testimony to the jury.

We need not decide whether the trial court was correct in its preliminary implication that the prosecutor could cross-examine defendant on matters beyond the scope of his direct examination. (But see Evid. Code, §§ 761, 772, subd. (d).) Though it expressed a tentative opinion, the court specifically refused to rule on matters of cross-examination before they arose. Lacking complete information, the court was well within its discretion to defer its decision. (See *Keith Daniel Williams, supra,* 44 Cal.3d at pp. 912-913.)

Defendant had no inherent right to a binding advance ruling which would spare him the necessity of raising specific objections before the jury. Even had the court's remarks constituted an *in limine* ruling against him, they would not have been binding at trial. (See Code Civ. Proc., former § 128, subd. 8 [now § 128, subd. (a)(8)]; cf. *People* v. *Campa* (1984) 36 Cal.3d 870, 885-886 [206 Cal.Rptr. 114, 686 P.2d 634]; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 76-77 [58 Cal.Rptr. 485].) No error occurred.

E. *Irrelevant aggravating evidence.*

■ Defendant complains the trial court instructed improperly at the penalty phase that the jury should consider "all of the evidence which has been received in any part of the trial of this case." He also urges the court erred in refusing his proffered instruction limiting the aggravating factors the jury could consider. He asserts the jury was thus improperly encouraged to consider in aggravation of penalty certain unflattering evidence presented at the guilt phase (such as his nonviolent escapes while awaiting trial on the capital charges, his drug use, and his "illicit" lifestyle), which evidence bore on no enumerated aggravating factor.[15]

Even if error occurred, however (see *People* v. *Williams* (1988) 45 Cal.3d 1268, 1324 [248 Cal.Rptr. 834, 756 P.2d 221] (*Michael Allen Williams*);

---

[15] Section 190.3 allows consideration of "the circumstances of the [present] crime" (subd. (a)), other *violent* offenses (factor (b)), prior felony *convictions* (factor (c)), extreme mental or emotional disturbance (factor (d)), victim participation in the capital crime (factor (e)), reasonable belief in moral justification (factor (f)), extreme duress or substantial domination by another (factor (g)), mental disease or defect, or intoxication, impairing the capacity to appreciate criminality or behave lawfully (factor (h)), defendant's age (factor (i)), minor participation in the capital offense (factor (j)), and any other mitigating factor (factor (k)). Nonviolent criminal incidents for which defendant was not convicted are excluded from the statutory list of aggravating factors.

*Boyd, supra,* 38 Cal.3d at pp. 772-779), it was harmless by any standard. The jury was told that it *"shall* take into consideration and be guided by" the enumerated factors of aggravation and mitigation, "if applicable." (Italics added.) Construing the instructions together, reasonable jurors would conclude they were to consider only the enumerated factors, but could draw upon all phases of the trial for evidence in that regard.

Moreover, the penalty verdict cannot have been affected by improper consideration of any guilt phase evidence. Defendant's escapes from custody were relevant at the penalty phase to rebut testimony by his expert witnesses that he was a good confinement risk. Defendant's concern that the instruction called attention to his drug-centered lifestyle is ironic in view of his effort to persuade the jury that his background, including his difficulty with drugs, was a *mitigating* factor. Under these circumstances, the asserted instructional error was plainly harmless. (*Michael Allen Williams, supra,* 45 Cal.3d at p. 1324.)

### F. *Factor (k)/sympathy.*

Defendant urges the trial court erred prejudicially when it declined his request at the penalty phase to (1) countermand "anti-sympathy" instructions given at the guilt phase, (2) give a "pro-sympathy" instruction, and (3) advise that the jury could consider any proffered mitigating evidence, whether or not it "extenuated" the capital crime.

■ Even when given at the penalty phase, the California standard instruction on the irrelevance of "mere sympathy" for the defendant (CALJIC No. 1.00) is not unconstitutional per se. (*California* v. *Brown, supra,* 479 U.S. at pp. 542-543 [93 L.Ed.2d at pp. 940-941] [plur. opn.], 545 [93 L.Ed.2d at p. 942] [conc. opn. of O'Connor, J.].) A fortiori, refusal to give a "pro-sympathy" instruction at the penalty phase is not error.

The sentencer must, of course, be adequately apprised of its duty to consider all mitigating character and background evidence proffered by the defendant. The 1978 death penalty law allows such consideration under section 190.3, factor (k) (any factor "extenuating the gravity of the crime"), and therefore meets the requirements of a valid death penalty law. (*Ghent, supra,* 43 Cal.3d at p. 777; *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440]; *Boyd, supra,* 38 Cal.3d at p. 775.)

■ However, instructions in the "unadorned" language of factor (k) have a potential for misleading the jury to believe that mitigating evidence is irrelevant unless it relates directly to the capital charges. Hence, we must examine the instructions and arguments as a whole to determine whether

the jury was adequately informed of the proper scope of mitigating evidence. (*California* v. *Brown, supra,* 479 U.S. at p. 546 [93 L.Ed.2d at p. 943 (conc. opn. of O'Connor, J.)]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 113-115 [71 L.Ed.2d 1, 10-11, 102 S.Ct. 869]; *Ghent, supra,* 43 Cal.3d at p. 777; *People* v. *Brown, supra,* 40 Cal.3d at pp. 536-537, 544, fn. 17; *People* v. *Easley* (1983) 34 Cal.3d 858, 878, & fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

Here the trial court expressly instructed that the jury was to consider separately "the defendant's personal history and family background." Defendant introduced extensive evidence on these subjects, which formed the principal basis of his penalty defense. Defense counsel stressed that the court would instruct on the relevance of defendant's history and background, which must be considered because "the law has a heart." The prosecutor made no objection.

In his own argument, the prosecutor did briefly "question the purpose, the relevance" of some of defendant's evidence to the extent "[i]t does not tell us too much about the 8th of July in 1979" (the date of the Opel murder). He implied his view that events from defendant's early childhood were relevant, if at all, only to the reasons why defendant pulled the trigger at the gallery. However, the instructions given in this case were contrary; they advised the jury that it must consider *both* "extenuating" factors *and* "personal history and family background." Under these circumstances, we conclude the jury cannot have been misled to defendant's prejudice about the relevant range of mitigating evidence.

### G. *Brown/Caldwell.*

In its 1978 version, section 190.3 provides among other things that the sentencer shall "consider, take into account, and be guided by" the enumerated aggravating and mitigating factors and "shall" impose a sentence of death "if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances. . . ." ▮ Defendant contends the trial court erred by rejecting his extensive proffered instructions explaining how the jury was to "weigh" the aggravating and mitigating factors and determine the appropriate penalty. These proposed instructions would have advised in effect that (1) mitigating factors are not limited by the statute, (2) any mitigating circumstance standing alone can support a decision that death is inappropriate, (3) aggravating factors must be proved beyond a reasonable doubt while mitigating factors are established by "any credible evidence," (4) jurors may assign whatever "weights" they deem appropriate to each aggravating and mitigating factor, (5) combined weight, not combined num-

bers, is dispositive, and (6) the sentencer must reject death if it has any reasonable doubt about the appropriate penalty.

In *People* v. *Brown, supra,* we concluded that the 1978 law's "shall/outweigh" language, properly construed, does not impermissibly deprive the jury of its constitutional discretion and responsibility to decide the appropriate punishment for the individual offense and offender. (40 Cal.3d at p. 541; see *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328 [86 L.Ed.2d 231, 238-239, 105 S.Ct. 2633].) We explained that the statutory "weighing" process is not mechanical or arbitrary and that each juror may assign "whatever moral or sympathetic value he deems appropriate" to each relevant factor. A juror, we said, need not vote for the death penalty "unless, upon completion of the 'weighing' process, he decides *that death is the appropriate penalty under all the circumstances.* . . ." (40 Cal.3d at pp. 540-541.)

However, we acknowledged that instructions in the literal statutory language are potentially confusing. For the future, we approved proposed CALJIC instructions explaining the weighing and sentencing process. We also undertook to evaluate every pre-*Brown* case "on its own merits" to determine whether the jury might have been misled about its duties and powers. (40 Cal.3d at pp. 544, fn. 17, 545, fn. 19.) In each such case, we examine the instructions and arguments as a whole to determine whether they conveyed a mistaken impression about the nature of the "weighing" process or the jury's duty to determine the appropriate penalty under all the circum- stances. (*People* v. *Myers* (1987) 43 Cal.3d 250, 274-276 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1280 [232 Cal.Rptr. 849, 729 P.2d 115].)

Here the instructions actually given by the court adequately explained these matters. First, they advised (as defendant had urged) that *any* facts used in *aggravation,* specifically including "other crimes," must be proved beyond a reasonable doubt. Second, they directed the sentencer to give independent consideration to the defendant's "personal history and family background." Third, as noted, they explained that the jury *must* reject death if mitigating factors outweighed aggravating, and were *free to do so even if aggravating factors outweighed mitigating.*

Thus, while the jury received no specific directions on "how to weigh," the instructions made clear that its fundamental task was to determine the proper punishment from the full range of relevant aggravating and mitigating evidence. They suggested that aggravating factors were more strictly construed than mitigating. Any inference that death was "mandatory" in any case was specifically refuted, and the instructions logically implied that

the death penalty should not be imposed if the sentencer doubted it was the appropriate penalty under all the circumstances. Hence, the court's refusal to give defendant's additional proffered instructions is no basis for reversal. (See *People* v. *Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366].)

Assuming there was any potential confusion, the prosecutor did not exploit it. The prosecutor told the jury it must "balance" and "weigh" the aggravating and mitigating factors, assigning each any weight the jury wished. He listed factors from his own perspective and argued their weights, but he never suggested the law required any result. He simply urged that the death penalty was warranted, under a concept of "Justinian justice," in light of defendant's conduct, attitude, and history. Defense counsel stressed that leniency was required if mitigating factors outweighed aggravating, but that "you don't have to vote for death" even if aggravating factors were deemed to outweigh mitigating. Under these circumstances, the jury was not misinformed.

H. *Instruction to reach penalty verdict "regardless of the consequences."*

Defendant also urges the trial court erred prejudicially when, as a final instruction at the penalty phase, it admonished the jurors to reach a "just verdict . . . regardless of . . . the consequences . . . ." He claims this instruction prevented the exercise of sympathy and diminished the jury's sense of responsibility.

In *People* v. *Brown, supra,* we declared that an instruction to act "regardless of consequences" could contribute to confusion about the jury's sentencing role and should therefore not be given at the penalty phase of a capital trial. (40 Cal.3d at p. 537, fn. 7.) We have since adhered to that statement. (E.g., *People* v. *Hamilton* (1988) 46 Cal.3d 123, 152 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Howard* (1988) 44 Cal.3d 375, 442-443 [243 Cal.Rptr. 842, 749 P.2d 279].) Where the instruction was given in a pre-*Brown* penalty trial, we review the record to determine whether it may have misled the jury to defendant's prejudice. (E.g., *Hamilton, supra,* at p. 152; *Howard, supra,* at p. 443.)

In the instant case the court instructed the jury as follows: "Ladies and gentlemen of the jury, the final phase of this case is now in your hands. I urge you to exercise your judgment in this case calmly and fairly without any passion or prejudice or without regard to public opinion or public feelings. [¶] You have now the power of life and death and both sides in this case expect that you will conscientiously consider the evidence and the law

and reach a just verdict regardless of what the consequences of your verdict may be."

Viewed in context, the instruction can only have been understood to relate to the jurors' duty to render a just verdict without regard to public response. Moreover, as we have explained, the instructions and arguments, viewed as a whole, adequately apprised the jury of its duty to consider all mitigating evidence, and to impose death only if that was deemed the appropriate penalty under all the circumstances. We thus conclude the "regardless of consequences" instruction could not have misled the jury about its sentencing responsibility.

I. *Background evidence as mitigating only.*

Defendant complains that the trial court, when directing the jury to consider defendant's "personal history and family background," was obliged to explain that this was a mitigating factor, and could not be considered in aggravation. We find no prejudicial error.

We have recognized that certain of the factors enumerated in section 190.3 are intended to be mitigating, not aggravating; as we have already noted, the prosecutor may not argue that the absence of these mitigating factors is aggravating. (*Davenport, supra,* 41 Cal.3d at pp. 288-290.) Moreover, as defendant points out, though his character and background is a *constitutionally* relevant *mitigating* factor, it is not listed in the 1978 statute as a factor which may be given *aggravating* weight. (*Eddings, supra,* 455 U.S. at pp. 113-115 [71 L.Ed.2d at pp. 10-11]; *People* v. *Brown, supra,* 40 Cal.3d at pp. 539-541; *Boyd, supra,* 38 Cal.3d at pp. 775-776; *Easley, supra,* 34 Cal.3d at p. 878.)

Nonetheless, we have indicated that neither the statute nor corresponding instructions are constitutionally inadequate for failing to enumerate which factors are mitigating and which are aggravating. (*Rodriguez, supra,* 42 Cal.3d at pp. 777-779.) We did direct in *Easley* that *future* juries be instructed under section 190.3, factor (k) (CALJIC No. 8.84.1, factor (k)) to consider both "extenuating" circumstances and "any other 'aspect of [the] defendant's character or record . . . that the *defendant* proffers as a basis for a *sentence less than death.*' [Citation.]" (34 Cal.3d at p. 878, fn. 10, italics added.) *Easley* did not suggest, however, that earlier trials are reversible insofar as the instructions departed from this wording.

Here we see no chance the jury was misled. The defense introduced all the character and background evidence, and both counsel argued on the assumption that its only relevance was to mitigate the penalty. Defendant

urges that the court created prejudicial ambiguity by linking the "personal history and family background" factor with that of "age."[16] Since he was 37 at the time of his capital crime, defendant asserts, the jury was unlikely to consider age mitigating, and might therefore assume the background and history factor was also aggravating. Under all the circumstances recited, we are not persuaded. We find no grounds for reversal.

J. *"Inapplicable" factors; labeling of factors as aggravating or mitigating.*

Defendant offered instructions that only the "circumstances of the current crime" (§ 190.3, factor (a)) and other "violent" criminal activity (*id.,* factor (b)) could be considered in aggravation. The proposed instructions cautioned that the current murder could not be deemed "aggravated" simply because it was in the first degree or was committed in the course of a robbery and burglary. Finally, they advised that the mitigating factors were limited to (1) mental or emotional disturbance (*id.,* factor (d)), (2) mental defect or intoxication (*id.,* factor (h)), (3) any other "extenuating" circumstance (*id.,* factor (k)), and (4) defendant's "personal history, family background and any fact that shows [defendant's] potential for rehabilitation."

The trial court rejected these instructions in the form presented. The jury was informed of all the factors set forth in section 190.3 (with an added reference to "personal history and family background"). The instruction given did not label specific factors as "aggravating" or "mitigating."

Defendant urges the court erred in refusing to delete from the instructions those factors not presented by the evidence, and by failing to advise which remaining factors were aggravating and mitigating. ▋ As previously noted, however, the instructions need not distinguish the aggravating from the mitigating circumstances. (*Ante,* at p. 517.) Nor need they delete "inapplicable" factors. The jury is told to consider only "applicable" factors, and it is entitled to know how the particular case fits into all the factors society deems relevant to the appropriate penalty. (*Ghent, supra,* 43 Cal.3d at pp. 776-777; see *People* v. *Melton* (1988) 44 Cal.3d 713, 770-771 [244 Cal.Rptr. 867, 750 P.2d 741].) Defendant's claims lack merit.

K. *"Extreme" mental or emotional disturbance.*

▋ Defendant urges the trial court erred by implying, contrary to his proposed instruction, that the jury could consider only "extreme" mental or

---

[16] In listing the factors to be considered, the court recited, "Nine, the age of the defendant at the time of the crime, and the defendant's personal history and family background."

emotional disturbance (§ 190.3, factor (d)). We have concluded, however, that factor (k), by allowing consideration of *all* "extenuating" circumstances, permits the jury to decide that less pronounced forms of mental or emotional disturbance mitigate the seriousness of the capital offense. (*Ghent, supra,* 43 Cal.3d at p. 776.) The prosecutor implied as much in his closing argument.[17] There is no basis to conclude the jury failed to give defendant's drug and mental-state evidence its proper mitigating weight. (*Ibid.*)

### L. *"Double-counting" of burglary-murder and robbery-murder special circumstances.*

The jury was instructed under section 190.3, factor (a), that the jury could consider in aggravation of penalty "the existence of any special circumstances found true" in connection with the capital crime. (Italic added.) Defendant urges this instruction improperly allowed the jurors to consider the burglary-murder and robbery-murder special circumstances as *separate* aggravating factors even though they were "based on an indivisible course of conduct having one principal criminal purpose." (Citing *People* v. *Harris* (1984) 36 Cal.3d 36, 63-65 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.].) We have explained, however, that this scheme violates neither constitutional proscriptions nor California's statutory prohibition of double punishment (§ 654). (*Melton, supra,* 44 Cal.3d at pp. 765-769.)

### M. *Overlap of section 190.3, factors (a) and (b); conviction and special circumstances as aggravating factors.*

Defendant next urges that the refusal of his proffered instructions (*ante,* at p. 518) improperly allowed "inflation" or "double counting" of aggravating factors in two other respects. ▮▮▮▮ The standard instructions given, he notes, fail to explain that the "violent" criminal activity described in factor (b) of section 190.3 includes only conduct *other than* "the circumstances of the present offense" described in factor (a). Further, he urges, the

---

[17]The prosecutor remarked: "The defense, members of the jury, presented evidence relative to the remaining factors in mitigation, and they include, and I note for your attention, extreme—extreme mental or emotional distress. [¶] Or whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effect of intoxication." He then began a discussion of the testimony of defendant's expert drug and psychological witnesses, saying, "Now, let's discuss a couple of these things, maybe jump around a little bit, because the law does provide for *any* extenuating circumstances, *any* other circumstance which extenuates the gravity of the crime." (Italics added.) Thereafter, he continued his disparaging evaluation of the credibility of defendant's drug and mental-state evidence. However, he never emphasized that mental, emotional, or intoxication evidence could not be considered unless it was "extreme."

final instructions erroneously allowed the jury to consider the *fact* of the underlying first degree murder conviction, and the *fact* that special circumstances were found true, as separate aggravating factors.

We have suggested that future juries should be instructed on the distinction between factors (a) and (b), but that omission of such instructions will rarely be prejudicial. The jury is unlikely to give undue weight to particular facts simply because they appear to fit into more than one statutory category. (E.g., *Melton, supra,* 44 Cal.3d at p. 763.) The prosecutor did not exploit any ambiguity by urging that the circumstances of the current offense should be counted twice in aggravation.

Defendant's remaining claims simply lack merit. The court's instructions, phrased in the language of section 190.3, did not encourage the jury to double-count the underlying *conviction* of murder. They simply, and properly, permitted it to consider the *facts surrounding the particular offense* to determine whether the nature of the capital crime was so aggravated as to weigh in favor of the death penalty.

Of course, the statute expressly permits the jury to consider "the existence of any special circumstances found to be true. . . ." (§ 190.3, factor (a).) For obvious reasons, the specific facts which validly rendered the underlying murder *eligible* for the death penalty are especially pertinent to the choice of punishment. "Re-use" of the special circumstance findings for this purpose is not unfair. Of course, factor (a) exhibits some internal duplication if construed literally, since the "special circumstances found . . . true" are a subset of the "circumstances of the present offense." However, as noted, juries are unlikely to "double-count" particular facts on this basis. The prosecutor made no such suggestion here. We see no ground for reversal.

N. *Death as appropriate beyond reasonable doubt.*

Defendant contends the trial court erred in refusing his proffered instruction that the jury could not impose death unless convinced beyond a reasonable doubt that aggravating circumstances outweighed mitigating and that death was the appropriate penalty. We have previously rejected the contention. (*Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

O. *Prosecution's failure to supply timely notice of aggravating evidence and discovery (§ 190.3).*

Defendant urges at length that the prosecution engaged in "literally contemptible" misconduct by refusing to comply with trial and appellate court

orders made under section 190.3 for notice and discovery of penalty phase evidence. We do not applaud the prosecution's effort to make its notice and discovery efforts as unhelpful as possible, but we see no violation of the statute or relevant court orders. In any event, defendant fails to raise even the possibility of reversible prejudice.

Section 190.3 provides in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." In 1979, the prosecution supplied the defense with police reports on numerous violent criminal incidents, other than the capital crime, which allegedly involved defendant. These reports included addresses of persons interviewed by the police. Among the reports was the January 1977 attempted robbery of "G.L. West." The prosecution further notified the defense that all information furnished in pretrial discovery should be deemed potential evidence in aggravation at the penalty phase.

In subsequent discovery motions, defense counsel sought, among other things, (1) a commitment as to which incidents the prosecution actually intended to present and (2) the names and addresses of the witnesses to be called in relation to each incident. In January 1981, with the already thrice-postponed trial apparently not imminent, the trial court addressed these requests. It ruled that an up-to-date list of penalty phase incidents and witnesses was not required in advance of trial but "suggested" that the prosecution furnish one. The prosecutor took the position that he had fully complied with section 190.3.

When defense counsel's further efforts to obtain informal cooperation from the prosecution failed, he sought mandate. The petition asserted that under section 190.3, he was entitled *reasonably in advance of trial* to know the specific evidence of aggravating circumstances the prosecution intended to offer. In *Keenan I,* the Court of Appeal agreed. It reasoned that the Legislature intended capital defendants to "be informed of the evidence to be used in aggravation within a reasonable period *before* the trial commences in order to properly prepare for the penalty phase." (126 Cal.App.3d at p. 587, italics in original.) The appellate court ordered issuance of a peremptory writ directing that defendant's "request for notice of the particular evidence to be introduced in support of the charge of aggravated circumstances" be granted. (*Ibid.*)

The writ issued in February 1982. Trial was thereafter set for November 1, 1982. The prosecution provided no new notice or discovery in response to the writ. A discovery hearing was held on September 1, 1982. The prosecutor again insisted that the police reports were adequate notice of incidents and witnesses. He maintained that he need not limit in advance the incidents he might ultimately choose to present nor disclose "how" he intended to prove each incident. He represented that he had no new addresses for any witnesses. Defense counsel sought disclosure of those incidents the prosecutor actually intended to prove, with a brief "outline" of witnesses, current addresses, physical evidence, and facts to be shown with respect to each. The trial court formally ordered the prosecution to supply, by September 10, notice of "specific incidents" to be used in aggravation, "names and current addresses" of all witnesses thereto, a list of the "physical evidence" to be introduced with respect to each, and updated names and addresses of witnesses "as known by the prosecution."

The prosecutor supplied a witness list, divided by incident, on September 13, and a list of physical evidence on September 27.[18] At a September 28 hearing, defense counsel complained that investigation had revealed the inaccuracy of some of the witness addresses furnished. There was no accusation or evidence that the inaccuracies arose from bad faith or inadequate investigation by the prosecution.

The first penalty phase witnesses were sworn on Friday, December 3, 1982. Pretrial motions were heard on Wednesday, December 1, and Thursday, December 2. Defense counsel again complained that defense investigation disclosed inaccuracies in the latest updated witness-address list. The prosecutor responded that he had received no recent "inquiries" from defense counsel about the whereabouts of potential witnesses.

Defense counsel raised the issue that "G.L. West," the name given by the alleged victim of the January 1977 attempted robbery, was apparently an alias for Darrell McElvane.[19] Counsel complained that he did not have McElvane's address. The prosecutor explained that the prosecution also had no address for McElvane, only a phone number where he could be reached, and that McElvane had requested this information remain

---

[18] Both lists still included all the incidents reflected in the police reports previously furnished, including incidents not ultimately presented at the penalty phase.

[19] Counsel noted that "[w]hen the case—when this case commenced, and counsel read his list of witnesses, he read G.L. West's name along with the ak [*sic*] of Darrell McElvane." Hence, it appears counsel knew of the name confusion before commencement of the penalty phase.

confidential. The court stated that the prosecution would either have to produce McElvane for a defense interview or disclose information on how he might be contacted. After further wrangling, the prosecutor disclosed McElvane's telephone number on the open record on December 2.

At the December 1 hearing, counsel also objected to the prosecutor's professed intent to recall Carlos Stevenson. Counsel argued that if any new evidence relevant to the penalty phase would be elicited, the prosecutor should disclose it in advance. The trial court rejected that contention.

Finally, counsel asked on December 1 for the felony records of all intended prosecution witnesses, saying they "should have been available to me prior to today. . . ."[20] The prosecutor agreed to supply this information the next day if possible. In open court on December 2, the prosecutor disclosed prior records for three intended witnesses, including two, McElvane and the prison assault victim, Richard Mayer, who actually testified.

The prosecution sought to present at the penalty phase four "other crimes" in aggravation of penalty. Though all but one (see discussion, *post*) were included in the notices previously given, they were but a fraction of the incidents of which the prosecutor had given notice.[21]

Defendant urges that, by this course of conduct, the prosecution wilfully disobeyed trial and appellate court orders under section 190.3 that it give *advance* notice of the "specific evidence" which would be presented in aggravation. He complains of the defense time and expense wasted on investigation of incidents and witnesses which ultimately were *not* presented. In particular, he objects to (1) the prosecutor's failure to update witness information, particularly that pertaining to McElvane; (2) the delay in providing potential witnesses' criminal records, (3) presentation of new and undisclosed testimony by Stevenson about an inchoate robbery plan involving defendant, and (4) failure to disclose in advance of the penalty phase that the "shank" used in the prison assault on Mayer had been lost.

The prosecution in this case unwisely took a "hard line" on discovery, disclosing information grudgingly and in a form calculated to impose the

---

[20] Neither defendant's briefs nor, so far as we can determine, the record disclose that he made any prior formal request for the felony records of prosecution witnesses.

[21] On December 1, the prosecutor had attempted for the first time to give notice of additional incidents he might wish to present. The trial court excluded evidence of these incidents on grounds the advance notice was insufficient.

maximum burden on defense investigation efforts. We do not condone the tactic of overwhelming the defense with possible aggravating evidence of which the prosecution intends to present only a fraction. The substantial energy expended by the prosecution in these efforts might best have been allocated elsewhere. However, there is no indication defendant was denied his rights under section 190.3 or *Keenan I.*

In the first place, neither *Keenan I* nor subsequent trial court orders expressly directed the prosecution to make a binding advance choice about which of numerous criminal incidents it would actually present at defendant's penalty trial. Nor do we read section 190.3 to require such a choice. As experienced trial counsel well know, problems with witness availability, admissibility of evidence, and the like, often require last-minute shifts in trial tactics. ■ Section 190.3 seeks to ensure that defendant will not be surprised at trial by aggravating matters of which he received no advance warning. This purpose is accomplished by requiring the prosecution to reveal any matters it may present, and by *excluding* any proffered incidents of which the defense was not apprised. We see no indication that the Legislature intended to go further and force the prosecution to present evidence on all matters as to which pretrial notice was given.

Furthermore, there is no record evidence that the prosecution failed to present any updated addresses once it was aware of them; the prosecutor consistently maintained the contrary. Nor, as noted, is there any indication the prosecution delayed production of potential witnesses' prior records once they were requested. (See fn. 20, *ante.*)

■ The trial court expressly declined to limit Stevenson's penalty phase testimony. Defendant complains bitterly that Stevenson was thus allowed to describe an elaborate robbery plan he and defendant had once concocted, but had never carried out. We agree that evidence of this incident was excludable on grounds, among others, that defendant received no advance notice the prosecution might present it. However, there was no prejudice. Ultimately, the trial court struck the new Stevenson testimony, with an appropriate admonition, on the ground that it did not show "violent" criminal activity admissible in aggravation under section 190.3, factor (b). Defendant's argument that the bell could not be unrung is not persuasive.

Finally, defendant makes no claim that his cross-examination was actually inhibited in any respect by any prosecution-caused lack of information

about the People's penalty phase witnesses. Nor has defendant demonstrated any prejudice from the prosecution's failure to advise in advance that the actual "shank" used in the Mayer assault had apparently been lost. (See discussion *post.*) There is no basis for reversal.

P. *"Other crimes" evidence.*

1. *Van Ness burglary.* ▮▮▮ Defendant urges that evidence of the July 1979 burglary, vandalism, and theft (of the carving knife) in the Van Ness Avenue apartment building should have been excluded. He suggests these events disclosed no crime involving actual or threatened violence to any person (§ 190.3, factor (b)), nor was there evidence they resulted in a felony conviction (*id.,* factor (c)). (See *Boyd, supra,* 38 Cal.3d at pp. 774-779; see also *People* v. *Phillips* (1985) 41 Cal.3d 29, 65-82 [222 Cal.Rptr. 127, 711 P.2d 423].) However, witness Blumenhein testified to a threatening approach by defendant while Blumenhein was attempting to prevent his escape. More fundamentally, the events surrounding the burglary were admissible to give context to defendant's subsequent violent episode of witness intimidation (see former § 136) against Blumenhein and his family. (See *Melton, supra,* 44 Cal.3d at pp. 756-757.) The fact that the witness intimidation incident had been reduced to conviction did not prevent presentation of the details of that violent criminal activity. (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]; cf. *People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480].) There was no error.

2. *Loss of Mayer assault weapon.* Just prior to commencement of penalty phase testimony about the 1980 prison assault on Richard Mayer, the prosecutor informed defense counsel that the "shank," or jail-made stabbing weapon, recovered in that incident had apparently been lost. The victim testified that the weapon used in the assault was a "round piece of steel with a point on it," approximately nine or ten inches long. For illustrative purposes, two other witnesses, the victim's father Robert and the investigating deputy, were shown another jail-made stabbing implement, marked as People's exhibit 45. Robert Mayer said that the weapon used in the assault was similar to exhibit 45, but looked "a little shorter." The deputy acknowledged that the original weapon had inexplicably been lost while in the custody of the sheriff's department. He stated that the lost item was metal, "about 12, 13 inches in length," as big around as a pencil, sharpened at one end, similar in appearance to exhibit 45 and about the same diameter, but "smaller [i.e., shorter] by two or three inches."

▮▮▮ Defendant timely sought exclusion of the "illustrative" exhibit, and all descriptions of the actual assault weapon, as more prejudicial than pro-

bative (Evid. Code, § 352) and as a sanction for negligent loss of the original "shank" (*People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]). The trial court rejected the contention, and defendant renews it here. He urges that the loss was "material" (*id.,* at p. 652), since it prevented him from showing that (1) the weapon actually used was not a lethal weapon, and (2) the assault was thus not particularly vicious or calculated to cause great bodily injury.

Whatever the merits of defendant's *Hitch* claims in this pre-Proposition 8 case,[22] we see no prejudice warranting reversal of the penalty judgment. Three witnesses, including the victim and his father, described the original weapon as a metal stabbing instrument of substantial diameter and length. Had it been available, defendant would not likely have established its "non-lethal" character. In any event, the jury heard convincing evidence that defendant, unprovoked, took Mayer by surprise, grabbed him around the neck, and stabbed him twice. The victim gave uncontradicted testimony that he received a wound near the highly vulnerable jugular vein; a punctured vein would have been fatal. Mayer sustained a large temporary "lump inside the neck," and a shoulder wound which left a permanent scar. There was also evidence of a previous and serious scuffle between the two men.

Under these circumstances, there seems little chance that loss of the original weapon, or use of substitute descriptions and illustrations, enhanced the seriousness of the assault in the jurors' eyes. In light of the overwhelming aggravating evidence, any marginal difference on that score was plainly harmless.[23]

Q. *Unanimous agreement on aggravating crimes.*

■ Defendant urges the court erred in refusing his proffered instruction that the jurors must unanimously agree on any uncharged criminal activity used as a factor in aggravation. In *Ghent, supra,* we rejected the contention that the court must give such an instruction sua sponte. (43 Cal.3d at pp. 773-774.)

Ghent's jurors, we noted, had been instructed that they must unanimously agree on the penalty determination, and that any uncharged criminal activity must be proven beyond a reasonable doubt. "Any [additional] re-

---

[22] Under federal law, the authorities have no duty to preserve evidence unless it possessed obvious exculpatory value and thus "might be expected to play a significant role in the suspect's defense. [Fn. omitted.]" (*California* v. *Trombetta* (1984) 467 U.S. 479, 485-488 [81 L.Ed.2d 413, 419-422, 104 S.Ct. 2528].)

[23] For similar reasons, we reject defendant's contention that he was prejudiced by the tardiness of the prosecution's disclosure that the original weapon had been lost.

quirement [of unanimity on each aggravating crime] would immerse the jurors in lengthy and complicated discussions of matters wholly collateral to the penalty determination which confronts them. Moreover, we see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty." (*Ibid.*)

Similar instructions were given here, and *Ghent's* reasoning is fully applicable. The court did not err in refusing a "unanimity" instruction.

R. *Inquiry re juror bias or misunderstanding.*

Defendant urges that remarks by the court to the jury during its penalty deliberations were fatally coercive. In defendant's view the court, having reason to suspect the jurors were "eleven to one for death," told them it expected and desired a quick verdict and improperly implied that the alternative was an "investigation" of the minority juror. Examined in context, the record shows the court responded correctly to indications of serious juror misunderstanding or misconduct and that its remarks were not coercive. A resume of the facts is required.

Penalty deliberations commenced on Thursday, December 9, 1982, and the jury was sequestered on Thursday evening. During deliberations on Friday afternoon, the jury foreman delivered a note to the court which stated: "One person doesn't remember that during the jury selection he said we could vote for the death penalty." The court summoned counsel and advised them of its initial intention to "investigate" the possibility that a juror had misrepresented on voir dire his ability to follow the law. Defense counsel, however, persuaded the court simply to reinstruct the entire jury on its sentencing powers and duties.

The jury was then summoned for a supplemental charge. The court prefaced its instructions by remarking that perhaps they "will resolve any problem that you have, and perhaps will answer any questions that you have, . . . ." The jurors were first admonished (1) that they should reach a verdict "if you can do so"; (2) that "[w]hile each of you must decide the case for yourself and not merely acquiesce in the conclusions of your fellow jurors," each juror must examine the issues with "candor[,] frankness[,] and . . . a proper regard for the opinions of your fellow jurors"; and (3) that they were obliged, "after full consideration of the evidence and the law, to agree upon . . . a verdict *if you can do so without violating your conscience and your individual judgment.*" (Italics added.)

At this point, the court also specifically advised as follows: "Of course, by pointing out to you the desirability of your reaching a verdict, I am not suggesting to any of you that you surrender your honest convictions as to what the evidence in this case has disclosed and of the weight and effect of the evidence in the case." Finally, the court restated that the jury "may" impose the death penalty if persuaded that aggravating circumstances outweighed mitigating, and "shall" impose life without parole if convinced that mitigating circumstances outweighed aggravating. The jury was ordered to resume deliberations, and the court asked to be advised by note "if there is any problem or difficulty" with its instructions.

Later the same afternoon the court, in the presence of both counsel, received a second note from the jury foreman. The note declared: "Your Honor, we have a juror who cannot morally vote for the death penalty." The court denied defense counsel's motion for mistrial, made on grounds the note indicated a "hung" jury. In the court's view, it was now "duty bound to investigate" whether "a juror . . . had misled us on the voir dire, . . . ."

With defense counsel's full agreement, the court decided to release the jury for the weekend and defer the investigation until Monday "in order," in counsel's words, that "the jurors can be free from the very intense pressure which exists in the jury room at this moment." Counsel also agreed that the court would "explain" to the jurors "what we're going to do" and admonish them "to search their conscience[s]" over the weekend about their duties to be fair and follow the law.

About 4:30 p.m., the jury was recalled to the courtroom. The court announced that, based on the foreman's note, "it appears to me that the jury has a problem." "I am required to investigate this," said the court, and to question both the foreman and "the one or more jurors who may be having difficulty in reaching a verdict. . . . [¶] I may have to permit the attorneys to question one or more of the jurors."

The court declared it had thought "the jury would have a verdict by this afternoon." Under the circumstances, however, the court offered the jurors the option of being released for the weekend "since I assume . . . you've been working hard all day and . . . would like, perhaps, to be able to go home and spend the weekend with your families and take care of your own personal business." Over the weekend, each juror should "search your conscience . . . and recall your oath . . . and your duty and responsibility to follow the law and judge the case . . . in accordance with your honest convictions as to what you believe is the appropriate penalty in this case." If the jury was released, said the court, "on Monday morning, I can question

the foreman, question several of the jurors, if there is a problem, and then make a determination . . . whether or not one or more of the jurors are refusing to adhere to the law and the evidence, and if that is the situation, then I'll have to make a determination as to how to proceed."

At this point, the foreman, Mr. Piazza, attempted to interrupt. The court admonished him not to reveal the jurors' thoughts or "what's going on" in deliberations. Rather, said the court, "I probably, Mr. Piazza, will question you on Monday morning individually with the attorneys present, and then I may have to question each juror individually, . . . ."

The foreman responded that a weekend release would be a "fine gesture," and that "by searching our conscience, . . . we should have a verdict come Monday." The court responded, "Good. Well, I'm glad to hear you say that. I appreciate that."

Next, the court delivered a long commentary, explaining why the jury had been sequestered the previous night despite the substantial imposition, and admonishing the jurors "for God's sake" not to do anything over the weekend "that would in anyway [sic] influence you one way or the other." Jurors should return at 9:15 Monday morning, said the court, but should not resume deliberations until advised to do so. Meantime, the court would "probably talk to your foreman" and "may talk to all of you individually," depending on what facts developed.

After the jurors had left the courtroom, defense counsel took issue with the court's statement "to the effect the Court would be pleased with the jury reaching a verdict on Monday." The court responded that it would try on Monday to correct any such misimpression, "because I don't feel that way [at] all." Counsel raised no objection to the court's remarks that it might have to "investigate" dissident jurors.

When the jurors returned on the morning of Monday, December 13, they were diverted to the jury assembly room and admonished again not to discuss the case. After interchange between court and counsel, the jury foreman was brought in for questioning. The court cautioned him not to reveal the details of deliberations, the numerical split, or the prevailing view within the jury. It then asked if any juror had stated he or she would not follow the law; "[b]y that I mean has a juror indicated that they [sic] would refuse to vote for the death penalty in every case or that they would vote for death and never vote for life imprisonment?" The foreman responded, "No."

Thereupon, the following colloquy occurred: "[¶] Q. [By the Court] All right. Based upon what has occurred, is it your opinion that a juror is

refusing to follow the law? [¶] A. I can't answer that without a little statement, your Honor." [¶] Q. All right, explain. [¶] A. It was—there was a little confusion of the jurors, and I am talking plural, as to the instructions of the judge the day of—the day we were challenged. And these jurors did not recall hearing that they may have to vote for the death penalty. And the statement I got this morning was, it has been resolved. The weekend that you gave us, your Honor, I believe cleared everybody's minds or whatever. So, that is where we stand now, your Honor."

The court denied defendant's renewed motion for mistrial. Defense counsel complained about the foreman's apparent reference to a morning discussion between jurors in violation of the court's admonition. The foreman was returned to the courtroom and again warned not to reveal the details of voting or views within the jury. The following exchange then took place: "[¶] Q. [By the Court] But you made that statement that the problem, you thought, was resolved. [¶] Have you talked to any other juror about the case today or discussed the case? [¶] A. No, sir. [¶] Q. Okay. [¶] A. Can I clarify that statement? [¶] Q. Yes. Without telling me—don't identify anybody. [¶] A. No. There was an apology. 'I needed the weekend.' And that was it. [¶] Q. That was the extent? [¶] A. That was the extent of the discussion with the jurors, okay, plural, again. [¶] Q. The individual who made that apology just approached you without any question from you? [¶] A. Yes, sir."

The court ruled that it need not investigate further and would allow the jury to continue its deliberations. After recalling the jury to the courtroom, the court readministered the previously given instructions on general obligations of a juror. These again stressed that jurors must follow the law, discuss issues frankly, respect and consider the views of other panelists, and reach a verdict if possible without violation of conscience or individual judgment.

The court then stated: "Ladies and gentlemen of the jury, one further comment before you return to the jury room to continue your deliberations. So that there is no misunderstanding in this particular case, the Court has not intended by anything that it may have said or done to intimate or suggest to you what you should find to be the fact on any question submitted to you or which penalty the Court believes is appropriate in this particular case. [¶] If anything I have said or done has seemed to so indicate, you must disregard it and form your own opinion of the evidence."

The jury recommenced deliberations. Within an hour, it announced a death verdict.

 Defendant claims that, in obviously stressful circumstances, with assertedly only a single juror holding out against the death penalty, the

court's expressed preference for a quick verdict, and its threat to "investigate" the jury's "problem," unfairly coerced the minority juror. However, our scrutiny of the court's conduct and remarks discloses no impropriety.

■■■ At the outset, we emphasize that when a trial court learns during deliberations of a jury-room problem which, if unattended, might later require the granting of a mistrial or new trial motion, the court may and should intervene promptly to nip the problem in the bud. The law is clear, for example, that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute.

As we recently explained in *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], "[s]ection 1123 gives the trial court the authority to discharge a juror 'found to be unable to perform his duty.' [Fn. omitted.] Section 1089 provides for the substitution of an alternate juror in the event one of the original jurors is discharged. [Fn. omitted.][24 ]. . . . California cases construing these statutes have established that, once a juror's [inability to perform his duty] is called into question, a *hearing to determine the facts* is clearly contemplated. [Citations.] Failure to conduct a hearing sufficient to determine whether good cause to discharge the juror exists is an *abuse of discretion* subject to appellate review. [Citations.]" (Pp. 519-520, italics added.)

■■■ A sitting juror's actual bias, which would have supported a challenge for cause, renders him "unable to perform his duty" and thus subject to discharge and substitution under sections 1089 and 1123. (*People* v. *Compton* (1971) 6 Cal.3d 55, 59 [98 Cal.Rptr. 217, 490 P.2d 537].) A juror may be disqualified for bias, and thus discharged, from a capital case if his views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844], quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521]; see also *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].) Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. (E.g., *Burgener, supra,* 41 Cal.3d at p. 517 [fellow jurors reported statements and demeanor indicating marijuana intoxication]; *Compton, supra,* 6 Cal.3d at p. 59 [mid-trial comments to

---

24 When the circumstances require it, a juror may be replaced at the penalty phase of a capital trial despite the usual requirement that, after substitution of a juror, all deliberations begin "anew." (*Fields, supra,* 35 Cal.3d at p. 351, fn. 9, limiting *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742].)

barber indicating actual bias]; see *People* v. *McNeal* (1979) 90 Cal.App.3d 830, 835-839 [153 Cal.Rptr. 706] [foreman reported juror's statements indicating personal knowledge of controverted facts].)

 Since the court has power to investigate and discharge jurors who refuse to adhere to their oaths, it may also take less drastic steps where appropriate to deter any misconduct or misunderstanding it has reason to suspect. Of course, any intervention must be conducted with care so as to minimize pressure on legitimate minority jurors.

 The foreman's notes in this case, written in ambiguous style by a layman, could reasonably be construed as stating that *one or more* jurors either harbored a disqualifying bias, or had misunderstood their obligations as capital penalty jurors. The first note suggested a juror was deviating from assurances made during "jury selection" about ability to "vote for the death penalty." The second note said flatly that a juror—not necessarily the one previously described—"cannot morally vote for the death penalty." Neither statement was limited by its terms to the case at hand. Singly and in combination, the notes could mean that a juror *or jurors* were now expressing absolute refusal to consider the death penalty *under any circumstances.*[25]

The court thus had ample cause to pursue the matter further. It conducted a discreet and properly limited investigation, which proved the inference of misconduct or misunderstanding unfounded. Defendant argues, however, that the court was *nonetheless* obliged to declare a mistrial because its *statements in open court* that an investigation might be necessary, and that a prompt verdict was expected and desired, were inherently coercive in light of the obvious jury division. We reject this attempt to place the court in a "no-win" situation.

In the first place, contrary to defendant's suggestion, there was no necessary inference that the court sought to coerce a lone juror, or a minority, who opposed a death verdict. Though each of the foreman's notes suggested that "a" juror was having difficulty recalling or implementing his oath to consider the death penalty, no implication arose that the same juror was described in each note (see discussion *ante*). Moreover, the court was careful to avoid learning the jury's divisions. On two occasions under direct questioning, the foreman himself indicated the problem was with "plural"

---

[25] Defendant suggests that the foreman's notes reflected no more than the recalcitrant juror's moral reluctance to impose capital punishment *based on the evidence in this case*—an entirely proper basis for refusing to vote for death. That inference was, however, by no means clear.

jurors. At one point, the court took direct issue with defense counsel's assumption that the jury stood eleven to one for death.[26]

Nor did the court's remarks, viewed as a whole, have a coercive connotation. Defendant points to the court's comments on Friday that it had expected a prompt penalty verdict and would "appreciate" a decision on Monday. A trial judge should refrain from placing specific time pressure on a deliberating jury and should never imply that the case warrants only desultory deliberation. Such comments risk persuading legitimate dissidents, whatever their views, that the court considers their position unreasonable.

Here, however, the court was at pains to dispel any such inference. The court neither insisted that a deadlock be resolved, nor urged minority jurors to give special attention to majority views, nor suggested that failure to reach a decision would have any specific consequences. (Cf., e.g., *People* v. *Gainer* (1977) 19 Cal.3d 835, 847-852.) On the contrary, it reinstructed on the broad scope of the jury's sentencing discretion, including its power to exercise leniency even if aggravating circumstances outweighed mitigating. Moreover, the court repeatedly cautioned that no juror should surrender his individual judgment and conscience, even if this meant no unanimous decision could be reached.[27]

When the jurors returned after a weekend's rest, the court, in an abundance of caution, stated specifically and at length that it had not intended by any earlier remarks to suggest what verdict the court deemed appropriate. The court stressed that jurors "must disregard" any such inference and "form [their] own opinion of the evidence." This admonition was more than sufficient to eliminate any possible misunderstanding.[28]

---

[26] Assuming the foreman's note meant that one or more jurors were refusing to *consider* the death penalty *under any circumstances,* no necessary inference arose about the division of views among jurors who *were* fairly debating the appropriate penalty. Recently, in *Lowenfield* v. *Phelps* (1988) 484 U.S. 231 [98 L.Ed.2d 568, 108 S.Ct. 546], the United States Supreme Court similarly observed that a poll of capital penalty jurors on the issue whether further deliberations would be helpful does not constitute a poll of the jury's division on the issue of sentence, and is not coercive. (P. __ [98 L.Ed.2d at pp. 578-579].)

[27] The United States Supreme Court recently approved instructions to a deadlocked capital penalty jury which were substantially similar to the instant court's charge that jurors must consider the opinions of other panelists and reach a verdict if possible without violation of individual judgment or conscience. (*Lowenfield, supra,* 484 U.S. at pp. __ [98 L.Ed.2d at pp. 576-579].)

[28] Defendant suggests the Monday admonition came too late since the supposed lone holdout may already have decided over the weekend to surrender to "majority" and court pressure. In the first place, this contention ignores the overall import of instructions given at *both* the Friday and Monday sessions (see text discussion, *ante*). In the second, it makes the unwarranted assumption that the court's specific disclaimer could have no effect on subsequent deliberations.

Nor do we find sinister import in the court's statements, before releasing the jurors on Friday, that on Monday it might have to "investigate" the jury's difficulties. We note first that defense counsel did not protest when the court said, outside the jury's presence, that it intended to explain to the jury "what we're going to do." The context of the court's remarks indicates it meant to mention in open court the possibility of an investigation.[29]

Moreover, though counsel objected promptly that the court should not have told the jurors it would be "pleased" with a prompt verdict (see discussion *ante*), he never took issue with the court's remarks to the jury about an investigation. Thus, at the least, "the potential for coercion argued now was not apparent to one on the spot. [Fn. omitted.]" (*Lowenfield, supra,* 484 U.S. at p. __ [98 L.Ed.2d at p. 579].)

Indeed, any potential for improper coercion seems minimal even in hindsight. Defendant implies the court's expressed intent to "investigate . . . whether or not one or more jurors are refusing to adhere to the law and the evidence" might persuade an already beleaguered dissident that the court, too, disapproved his or her minority position, even suspected it was illegal. On the other hand, defendant suggests, the court offered a weekend respite to "search your conscience" and "recall your oath." The threat was clear, in defendant's view—conform over the weekend or face a humiliating inquiry by the court.

We cannot accept this view of the facts. In the first place, nothing in the court's remarks singled out an individual juror or suggested the court knew the identity of any juror who was having a "problem." On the other hand, the person or persons to whom the foreman's notes referred almost certainly knew he had sent them. Since it would be logical for the court to take some action in response to the notes, as was its obligation, judicial declarations to that effect were unlikely to create additional pressure.

It is difficult to see how coercion arose from the court's decision to postpone any further action until after a weekend recess. The express purpose of the recess was to *relieve* the jurors of excessive stress, and defendant's counsel gave wholehearted concurrence on that basis. As counsel must

---

[29] The following exchange occurred in chambers: "THE COURT: All right. I am going to have the bailiff bring the jury in, but before I do that, *I think I should explain to the jurors what we're going to do.* [¶] *I am going to break and investigate the matter on Monday morning.* . . . [¶] We'd ask each of them to go home over the weekend and *search their conscience regarding their obligation to be fair—a fair and impartial juror and decide the case on the evidence and the law.* [¶] *Basically just ask them to reconsider their oath as jurors in the case.* [¶] Any objection to that?

"MR. SCHWARTZBACH [defense counsel]: I think they may also consider their conscience.

"THE COURT: Certainly. [¶] All right. Bring the jury in." (Italics added.)

have assumed, the weekend respite offered legitimate minority jurors an opportunity to gather strength and resolve.

In the course of its Friday comments, the court had drawn a careful distinction between honest disagreement on the facts, which was proper, and refusal to consider the evidence, which was not. If a juror's minority position was fair under these standards, a post-recess court investigation could be expected to provide vindication and relief from further overbearing pressure by fellow panelists.

Finally, the court was within its rights to seek to *avoid* an investigation by exhorting any jurors who *were* refusing to deliberate impartially to reconsider their positions and adhere to their oaths. A court does not engage in improper "coercion" when it reminds jurors of their obligations under the law.

No impropriety appears in the court's comments or in its overall conduct of the episode. We find no basis for reversal.[30] (See also fn. 35, *post.*)

S. *Alleged misconduct by Juror Walker.*

Defendant cites two alleged instances of prejudicial misconduct by Juror Walker. Again, we see no circumstances which undermine the validity of the penalty verdict.

1. *Note-passing to spectator "on our side."* On Thursday, December 9, 1982, just prior to closing arguments in the penalty phase, the court learned that Juror Walker had passed a note to the sister of the murder victim, Robert Opel. Walker was immediately questioned by the court in chambers, without counsel present. Walker explained that an acquaintance had accosted him in the corridor and confirmed that Walker was a juror in the Keenan case. The acquaintance then asked Walker to give a note to Opel's sister if she was present. The man indicated he was an old friend of the sister, that they had been out of touch, and that the note simply gave a telephone number where she could reach him if she wished. The intended recipient was described as having "long black hair." Walker had seen a woman meeting this description in the courtroom; like other jurors, he had assumed she was a relative of the victim.

Walker said he carried the note around in his wallet for several days because he knew he was not supposed to speak to any spectator and "didn't want to deal with it." Finally, he handed the note to the woman without

---

[30] We also reject defendant's hypertechnical suggestion that a mistrial was in order because the "apology" reported by the jury foreman was an unauthorized communication.

reading it.[31] Walker stated that when the man "asked if Opel's sister was in the courtroom[,] . . . I said that, of all the people, we know the regulars, I take it for granted this woman sits on *this side* would be something to do with this." (Italics added.) At a later point in the chambers discussion, Walker remarked, "Honestly, what—we, as a collective, sat back there and we know who most of the regulars are in the courtroom, outside of the witnesses and stuff. There's—we'll sit there and say, 'Well, *this lady must be on our side,*' or she's not looking at so and so." (Italics added.)

The court admonished Walker to "[k]eep in mind though there are not sides to this case. Our side or their side or anything like that. [¶] As a juror you are an objective and impartial observer and you are not to pick sides in the case. You have to judge the case on the evidence." Walker said he agreed "[a]bsolutely" and stated in response to a direct question that he "absolutely" felt he could be a fair juror.

The court then released Walker and summoned counsel. It summarized the discussion with Walker, noting Walker had been asked whether the incident would affect his ability to be fair. The court stated its belief that there was "no problem." It did not, however, advise counsel of Walker's "on our side" comment. Defense counsel expressed concern about Walker's violation of the no-communication admonition. At this point, however, he did not request that Walker be excused and did not ask the court to declare a mistrial.

On Monday, December 13, the second day of penalty deliberations, defense counsel moved for a mistrial. The defense motion asserted Walker's misconduct in passing the note, and also argued that the court's failure to disclose the comment about "our side" had denied counsel the opportunity to investigate, before deliberations began, whether one or more jurors had prejudged the sentencing issue.[32]

The court responded that, during the trial, Opel's sister had been sitting directly behind the prosecution table, which was on the side of the courtroom nearest the jury. According to the court, it had assumed Walker's "on our side" remark referred to the "physical layout of the courtroom." "[A]s a matter of caution," however, the court had admonished Walker not to take sides.

The motion for mistrial was denied, and the court indicated its willingness to excuse Walker if further questioning demonstrated it was neces-

---

[31] Apparently Walker tried twice to deliver the note to Opel's sister. The first time, she rebuffed him, saying "Don't talk to me." Walker replied, "Okay, I won't." He then decided to hand the note to a bailiff, who thwarted his plan by leaving to go on a break. Walker implied he finally personally delivered the note because his acquaintance "wanted to get in touch with her. Evidently she's been out of town or unapproachable."

[32] Counsel had apparently learned of the remark by reading the daily transcripts.

sary. Walker was again summoned and examined by the court in counsel's presence. Defense counsel's requests to conduct his own examination were denied. Walker reiterated his prior account of the note-passing incident. The following exchange then occurred between the court and Walker: "Q. When you were talking to me about this incident concerning the note, you indicated, if I can find it here—we have a record of everything that goes on, and that is how this was brought to my attention. You made a statement that the lady was 'on our side,' something to that effect. [¶] A. *I meant this side of the courtroom.* [¶] Q. You meant the side of the courtroom the jury is on? [¶] A. Yeah. [¶] Q. You didn't mean anything about the prosecution side of the case or anything like that? [¶] A. No, sir, not at all." (Italics added.)

At the conclusion of the questioning, the court told Walker, "I had assumed that you were talking about your side of the courtroom, and that is how you identified the lady because she had been sitting there, and she does have long black hair." Walker replied, "I don't turn around and watch everybody that comes through the door, but I have noticed certain people in the courtroom, and I only meant that she was sitting on this side of the courtroom."

After Walker departed chambers, defense counsel complained that the court had not adequately investigated what Walker meant by his suggestion on December 9 that "this lady *must be* on our side" (italics added). This phraseology, counsel asserted, could not reasonably be interpreted as a mere reference to physical location in the courtroom. Counsel then moved to excuse Walker. The court briefly took the matter under submission, then denied the motion because "I just don't believe that Mr. Walker has done anything improper that would justify his being excused in the case."

Defendant renews his contention that he was denied a timely opportunity to determine whether good cause existed to excuse one or more jurors. He also suggests he was denied his rights to counsel and confrontation at critical stages of the proceedings, the two examinations of Juror Walker.

 However, defendant fails to persuade us that the court was obliged to allow cross-examination of Walker. Under California law, the *court* must conduct "an inquiry sufficient to determine the facts" when placed on notice "that good cause to discharge a juror may exist." (*Burgener, supra,* 41 Cal.3d at p. 519.) In a criminal case, such investigation may include live testimony where appropriate (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People v. Pierce* (1979) 24 Cal.3d 199, 207-208 [155 Cal.Rptr. 657, 595 P.2d 91]), but no decision has suggested *counsel* must be allowed to examine witnesses on the misconduct issue.

The prevailing federal rule is in accord; the court has broad discretion as to the mode of investigation of allegations of juror misconduct. (E.g., *United States* v. *Bradshaw* (10th Cir. 1986) 787 F.2d 1385, 1389; *United States* v. *Kelly* (1st Cir. 1983) 722 F.2d 873, 881, cert. den. (1984) 465 U.S. 1070 [79 L.Ed.2d 749, 104 S.Ct. 1425].) Even cases suggesting a "full investigation" is necessary in such cases imply that this duty is satisfied by the *court's* examination of pertinent witnesses. (E.g., *United States* v. *Brantley* (11th Cir. 1984) 733 F.2d 1429, 1440, fn. 20, cert. den. (1985) 470 U.S. 1006 [84 L.Ed.2d 383, 105 S.Ct. 1362].) The court conducted an extensive investigation here, and we find no abuse of discretion in its mode of procedure.

 Moreover, the record amply supports the trial court's conclusion that no prejudicial misconduct occurred. Obviously Walker violated his duty of silence when he passed the note to a trial spectator, but any presumption of prejudice from this misconduct (see, e.g., *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]) was fully rebutted. Walker's explanation made clear that the brief communication had no relation to the issues in the case and did not impair his duty to serve impartially.[33]

The court was also within bounds in concluding that Walker's "on our side" remark was an innocent reference to physical location. His ambiguous statement that Opel's sister *"must be* on our side" had been preceded by a similarly directed comment about his observation that she was *"sit[ting]* on *this side . . . ."* Walker repeatedly and vehemently insisted that his remarks dealt only with where the woman was sitting in the courtroom, and that he "absolutely" understood his duty to remain impartial and not "take sides." The court stated at several points that this had been its initial assumption. Since the court could observe Walker's demeanor when the critical remarks were made, we must defer to its assessment of his credibility. No reversible misconduct appears.

2. *Jury-room outburst.* Subsequent to the penalty verdict, defendant moved for a new trial on grounds, among others, that Juror Walker had committed prejudicial misconduct (Code Civ. Proc., § 657, subd. 2) by his diatribe against another panelist. The court dismissed the claim of misconduct and denied the new trial motion. Defendant urges the claim of misconduct received inadequate investigation. We agree with the trial court, however, that the conduct asserted, even had it been proven, was insufficient to impeach the penalty verdict. We explain in further detail.

The motion for new trial included the declaration of defense investigator Cathy Kornblith. Kornblith declared Juror Walker had told her that, on

---

[33]Defendant makes a strained argument that Walker's willingness to break silence in order to deliver the note to a person he knew was related to the victim indicates his undue "sympathy" for the victim, and thus for the prosecution. We are not convinced.

the afternoon of Friday, December 10, he lost his temper in the course of deliberations. According to Kornblith, Walker said he pointed a finger at Juror Zadonsky, an elderly woman who was the lone holdout against death, and said, "If you make this all for nothing, if you say we sat here for nothing, I'll kill you and there'll be another defendant out there—it'll be me."

In a January 14, 1983, hearing on the new trial motion, defense counsel said he had subpoenaed Walker, who refused to sign a declaration but had agreed to testify in open court and was present. The court opined that a juror could not be called to impeach the verdict, that the "threat" was simply a display of temper during deliberations, and that the "mental processes" of jurors could not be investigated. However, the court granted a one-week continuance to enable the defense to gather further evidence.

Subsequently, the defense submitted further declarations by the jury foreman, Piazza, by Kornblith, and by counsel. Piazza stated that Walker repeatedly shouted at Juror Zadonsky, the lone holdout, during the deliberations, and at one point shouted she should vote for death. On the afternoon of December 10, Walker became angry and shouted something at Zadonsky. Piazza could not recall the "specific words" used. Zadonsky began crying and shaking and went to the bathroom "where I believe she vomited."

Piazza said he expressed the view that it would not be right to vote while Zadonsky was in this emotional and physical state. Instead, two notes were sent to the judge stating that a juror was having a problem. After the subsequent weekend recess ordered by the court, Piazza declared, Zadonsky approached him on Monday morning and "apologized for having been so emotional on Friday afternoon."

Kornblith declared that in subsequent conversations with Walker, he admitted again he had threatened Zadonsky's life, agreed to tell "the whole story" in court, but refused to sign a "confining" written statement. Counsel's declaration recounted Walker's numerous efforts thereafter to avoid contact with him.

The prosecution filed a counterdeclaration by Walker. In this declaration, Walker denied any death threat. He further claimed he had not engaged in repetitive shouting at Zadonsky, and had never shouted that she should vote for death. Walker stated that on a single occasion, during the afternoon of Friday, December 10, he rose from his chair and said to Zadonsky, "I don't think you are as stupid as you are acting."

At a hearing on January 21, counsel stated that he had contacted Zadonsky, who was unwilling to sign a declaration "and simply does not want to

be involved in this any more . . . ." The court again denied a defense request that Walker be compelled to give live testimony. It reiterated that "Mr. Walker cannot be called as a witness at this hearing, nor can any other juror, in my opinion."

The court admitted into evidence the declarations of Piazza and Walker, accepted counsel's declaration for the limited purpose of showing defense efforts to contact Walker, and excluded Kornblith's declarations as hearsay. It then denied the new trial motion. The court found "insufficient evidence" of misconduct warranting a new trial. Defendant, said the court, was improperly attempting to delve into the details of deliberations and the jurors' "mental processes." Moreover, "[i]n my opinion, the alleged statement is not of a character that it would likely have influenced the verdict." Heated debate is expected of jurors, said the court, and to call a juror as a witness to impeach the verdict "touches on the integrity of the jury system" (citing *Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104]).

Defendant admits the current record, stripped of inadmissible hearsay, fails to establish that Walker specifically threatened to kill Zadonsky. However, he renews his contention that the court erred by refusing to compel a testimonial examination of Walker on the issue.

We need not resolve the issue. Even if the described "threat" occurred, we must conclude as a matter of law that it was not prejudicial misconduct which impeaches the verdict. The outburst described in Kornblith's declarations was particularly harsh and inappropriate, but as the trial court suggested, no reasonable juror could have taken it literally. Manifestly, the alleged "death threat" was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist.

"Jurors may be expected to disagree during deliberations, even at times in heated fashion." Thus, "[t]o permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression." (*People* v. *Orchard* (1971) 17 Cal.App.3d 568, 574 [95 Cal.Rptr. 66].)[34]

---

[34] In *Orchard,* Juror Bosman stated in an affidavit that, after several hours of deliberation, she had sent the foreman a note expressing her unshakable belief in defendant's innocence; the foreman "had torn the note up, [and] stood and angrily chastised her for 10 to 15 minutes before the other jurors for not keeping an open mind, producing in her feelings of embarrassment, humiliation and a desire to leave as soon as possible and causing her to vote appellant guilty. [Fn. omitted.]" (17 Cal.App.3d at p. 572.) The *Orchard* decision carefully distinguished the case of intimidation by a *court officer,* as presented by *Hutchinson, supra,* 71 Cal.2d at page 351. (17 Cal.App.3d at p. 574.)

Because of the freedom necessarily accorded jury debate, other jurisdictions appear equally reluctant to entertain claims of coercive deliberations. Many, of course, preclude all inquiry about events inside the jury room. Our research has disclosed only one case in which a claim

Defendant urges that Zadonsky's "objective" manifestations of stress, such as shaking, crying, and vomiting, may be considered as proof the verdict was improperly affected. However, *Hutchinson* was not intended to establish such an indirect means of probing a juror's subjective mental processes.

Even if such proof were competent, it is singularly weak in this case. Juror Walker's angry display occurred on Friday afternoon. Though the jury was subsequently recalled to the courtroom and asked how it wished to proceed in light of the notes received from the foreman (see discussion, *ante*), Zadonsky made no effort, public or private, to apprise the court of Walker's intimidating behavior. When the jurors returned after the weekend recess, Zadonsky apologized to the foreman for being so "emotional" on Friday. After the penalty verdict was returned, the jurors were individually polled. Zadonsky affirmed, both by nodding and by oral response, that this was her individual verdict. Subsequently, she apparently declined to state under oath that she had been threatened or coerced. We find no basis for reversal on grounds of juror misconduct.[35]

### T. *Postverdict remarks by trial judge.*

After the verdict was entered, the court released the jurors from the admonition of silence, stating several times that it was henceforth "not improper" to speak with anyone they wished about the trial, and that this decision was "up to you." "I'm sure, from experience," said the court, "that the attorneys would like to talk to you about the case." The court also stated that jurors often said later they did not want to talk, felt "put-upon" by such requests, and wondered whether it was proper to refuse. "You don't have to [talk]. You may keep your thoughts to yourself. You may refuse to

---

of intimidation among jurors received favorable consideration. There, in a decision the court itself deemed a departure from general principles, a death judgment was reversed and remanded for consideration of claims that, after 27 hours of deliberations, all 11 majority jurors subjected the lone holdout for life imprisonment to an exhausting and unending torrent of abuse until he acquiesced in a death verdict to escape the pressure. (*Wharton* v. *People* (1939) 104 Colo. 260 [90 P.2d 615, 616-620]; see also authorities collected in Annot. (1985) 39 A.L.R.4th 800.)

[35] Defendant urges that the "death threat" incident reinforces an inference of coercion in the court's remarks to the jury the same afternoon. (See *ante,* at pp. 527-535.) We now know, defendant suggests, that Zadonsky was the "lone holdout" against death and was enduring intense pressure from her peers. Defendant urges that a juror in Zadonsky's position would be especially vulnerable to coercive influence by the court. Of course, the trial judge was unaware of the jury's division and the emotional situation in the jury room when he spoke to the jurors on Friday afternoon. As noted, neither Zadonsky nor any other juror had informed the judge of Walker's outburst. Assuming that fundamental fairness obliges us to consider the coercive impact of the court's comments "in [their] context and under all the circumstances," even those then unknown (cf. *Jenkins* v. *United States* (1965) 380 U.S. 445, 446 [13 L.Ed.2d 957, 958, 85 S.Ct. 1059]), we still conclude, for reasons already stated (see *ante,* at pp. 532-535), that the jury's deliberations were not fatally tainted.

talk to anybody. . . ." Indeed, said the court, "I personally have great beliefs in the sanctity of the jury room and I feel that it is sometimes unnecessary for jurors to have to express views or opinions or to be asked to—for their feelings about the case, so I will leave it up to you to determine whether or not you want to talk to anybody about the case."

■ Defendant objected to these remarks and renews his contention that they improperly discouraged jurors from cooperating with defense investigators gathering evidence for posttrial motions. But there was nothing inaccurate or imbalanced in the court's statement of the applicable law. The court's expression of personal opinion was carefully disclosed as such, and the jurors were repeatedly told it was entirely proper to communicate with the defense if they wished. We see no impropriety in the court's comments.

U. *Sequestered voir dire.*

■ Pursuant to *Hovey, supra,* 28 Cal.3d at pages 69-81, a sequestered voir dire was held on issues pertaining to the death qualification of jurors (see *Wainwright, supra,* 469 U.S. at pp. 424, 432-433 [83 L.Ed.2d at p. 857]; *Witherspoon, supra,* 391 U.S. at pp. 521-523 [20 L.Ed.2d at pp. 784-786]). The court, however, overruled defense counsel's repeated requests and efforts to include in the sequestered portion of the voir dire questions about panelists' attitudes on such subjects as drugs, psychiatry, homosexuality, and witchcraft, insofar as they might affect the juror's penalty choice in a particular case. The court expressed its willingness to allow questions on all these issues during general voir dire, and to consider individual cases in which a juror's answers might justify further private inquiry on the issue of death qualification.

Defendant renews his contention that the court's restrictive ruling violated *Hovey.* There the majority cited studies suggesting that when prospective jurors are subjected to repeated questioning of their fellows in open court about willingness to assess the death penalty, they may become desensitized and uncertain about their own reluctance to vote for capital punishment. *Hovey* therefore imposed, as a prospective rule of judicial procedure, a requirement that each juror be privately questioned about his qualifications to serve on a capital jury. (28 Cal.3d at pp. 80-81.)

*Hovey* expressly provided that the rule of sequestration *does not* extend to questions routinely pertinent in a noncapital case, including those which probe attitudes toward potentially controversial defenses ("insanity, diminished capacity, self-defense, or alibi"), facts (defendants' race, drug use, or sexual conduct), or rules of law ("defendant's right not to testify, presumption of innocence, truth beyond a reasonable doubt, or jury unanimity").

"However, if any of these questions *in a specific case* are relevant to the *death-qualification* of the panel or may tend to identify those prospective jurors whose views on capital punishment render them *ineligible,* then those *particular* questions should be answered individually and in sequestration. It is the duty of trial counsel to alert the court in advance of voir dire as to which of those general topics are likely to call forth answers bearing on the death-qualification of the jury." (28 Cal.3d at p. 81, fn. 137, italics added.)

Manifestly, this latter proviso must be reasonably construed. It does not permit defendant to obtain sequestered voir dire for his questions about juror attitudes on any and all controversial issues in the case simply by urging that he must determine whether their presence might affect the jurors' penalty choice. Any such expanded interpretation could easily require the bulk of voir dire in a capital case to be conducted individually. It would ignore *Hovey's* explicit limitation to "specific case[s]" and "particular questions" which arise with respect to individual jurors.

Here, counsel at no time "alert[ed] the trial court" to any such individual situations. He simply sought to convert examination on all controversial issues into a sequestered voir dire on "attitudes toward penalty." On the other hand, the court expressly left itself open to the possibility of expanded private questioning where it appeared appropriate in particular cases. There was no *Hovey* violation.[36]

## V. *Proportionality review.*

Defendant requests that we review his sentence to determine whether it is constitutionally disproportionate in light of the facts of his crime, his personal characteristics, and the penalties imposed in other cases. ██ Of course, California's death penalty scheme satisfies the federal Constitution despite its failure to provide for proportionality review. (*McClesky, supra,* 481 U.S. at pp. 307-308, and fn. 28 [95 L.Ed.2d at p. 288]; *Pulley, supra,* 465 U.S. at pp. 50-54 [79 L.Ed.2d at pp. 40-43].)

Assuming such review is required under the state Constitution (Cal. Const., art. I, § 17; see, e.g., *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697]), the facts stated above indicate that defendant's sentence is fully proportionate to his individual culpability. Nor

---

[36] We note that *Hovey* ordered sequestered voir dire only as to eligibility to serve on a capital penalty jury. At the time this case was tried, only those persons who professed *absolute* bias for or against the death penalty *without regard to the evidence* were excludable for cause on the basis of their penalty views. (*Witherspoon, supra,* 391 U.S. at p. 521, fn. 21 [20 L.Ed.2d at p. 785]; see *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33].) Thus, it is not clear in any event that questions about how particular unpleasant facts in the case might affect the jurors' penalty views qualify for the *Hovey* sequestration procedure.

can he assert his punishment is more severe than that imposed for less serious crimes or disproportionate to the sentence imposed for similar crimes in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].)

Finally, defendant contends that capital defendants are denied equal protection unless they receive the benefits of "disparate sentence" review accorded noncapital convicts under the Determinate Sentencing Act. (§ 1170, subd. (f).) We have rejected this contention. (*Allen, supra,* 42 Cal.3d at pp. 1286-1288.)

## V. Conclusion

Whether viewed singly or in combination, we find no errors warranting reversal of the guilt or penalty verdicts. We therefore affirm the judgment in its entirety.

Lucas, C. J., Panelli, J., and Arguelles, J., concurred.

KAUFMAN, J.—I concur in the affirmance of the judgment as to guilt and the sustaining of the special circumstance findings. However, I respectfully dissent from the affirmance of the judgment as to penalty. In my view the record discloses a reasonable possibility (*People* v. *Brown, ante,* pp. 448-449) that certain remarks by the court during the penalty phase, superimposed upon an emotional episode that had already occurred in the jury room, had an improperly coercive effect upon the jury's deliberations and improperly influenced the verdict.

To begin with, the majority misconceives the nature of defendant's contentions regarding coercion. Principally, defendant raises two related points: (1) a very aggressive verbal attack by a male juror on an elderly female holdout juror during the jury's deliberations resulting in the holdout's becoming emotionally upset and sick to her stomach; and (2) potentially coercive remarks by the court to the jury when they were having difficulty reaching a verdict, which the holdout juror must have believed were directed at her.

The majority insists on treating these issues separately, concluding that, individually, neither the episode in the jury room nor the court's remarks were coercive. This approach is inappropriate, however. "The basic question . . . is whether the remarks of the court, *viewed in the totality of applicable circumstances,* operate[d] to displace the independent judgment of the jury in favor of considerations of compromise and expediency." (*People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353], italics added.) The heated verbal attack upon the holdout juror earlier the same day by another juror was part of the coercive atmosphere in which

the holdout juror heard and interpreted the court's statements. The question to be determined is how those statements likely affected her. Thus, the jury's division and the emotional state of the holdout juror at the time the court made its remarks are clearly relevant to the analysis. Fairness and accuracy dictate that the two contentions be considered together rather than separately.

The record discloses the following. Juror Zadonsky was an elderly woman. A defense investigator's declaration indicates that, on the afternoon of Friday, December 10, Zadonsky was the lone holdout against imposing the death penalty. According to that declaration and one by Jury Foreman Piazza, Zadonsky was verbally attacked by Juror Walker as he tried to convince her to change her mind and vote for death. The investigator said Walker's tirade included an outright death threat; Piazza could not recall the specific words Walker used. According to Piazza, Walker's tirade left the elderly Zadonsky crying and shaking. Zadonsky went to the bathroom where, Piazza believed, she vomited.[1]

Foreman Piazza then told the other jurors that Zadonsky should not vote at that time because she was so upset. The foreman sent the judge a note which stated: "*One person* doesn't remember that during the jury selection he said we [*sic*] could vote for the death penalty." (Italics added.) After being summoned for additional instruction, the jury was sent back to the jury room. Later that same afternoon, the foreman sent the judge a second note which stated: "Your Honor, we have *a juror* who cannot morally vote for the death penalty." (Italics added.) The judge then recalled the jury to the courtroom and spoke to the jurors.

The court first announced its belief that "the jury has a problem," and stated the court was required *to investigate* by questioning the foreman and, perhaps, "the *one or more jurors who may be having difficulty in reaching a verdict* . . . ." (Italics added.) The court also stated it might have to permit counsel "to question *one or more of the jurors.*" The court said that if necessary it would "make a determination . . . whether or not *one or more of the jurors are refusing to adhere to the law and the evidence* . . . ." The court declared *it had thought "the jury would have a verdict by this afternoon."* (Italics added.) The court stated, however, it intended to recess at that time and send the jury home for the weekend. It advised the jurors to recall their oaths and search their consciences.

---

[1] As the majority notes, the record contains a counterdeclaration by Juror Walker denying the death threat but admitting that he rose from his chair sometime on Friday afternoon and said to Juror Zadonsky: "I don't think you are as stupid as you are acting." Apparently, in his declaration Walker did not controvert the reports that Zadonsky had suffered a severe emotional and physical reaction during the episode.

The court then recognized Jury Foreman Piazza, who stated that a weekend release would be a "fine gesture," and that "by searching our conscience . . . we should have a verdict come Monday." The court responded, *"Good. Well, I'm glad to hear you say that. I appreciate that."* (Italics added.)

On Monday morning, the jury reassembled, and before any further jury deliberations commenced Jury Foreman Piazza was brought into the courtroom individually for questioning by the court. He said that "the statement I got this morning was, it has been resolved. The weekend that you gave us, your Honor, I believe cleared everybody's minds . . . ." The foreman was then apparently returned to the jury room and deliberations resumed.

Defendant complained at this point that the foreman's statement indicated the jury had discussed the case in violation of the standard admonition. Foreman Piazza was once again brought into the courtroom. He reported that the only discussion which took place was "an apology. [The juror in question had stated:] 'I needed the weekend.' And that was it." The court asked, "The individual who made that apology just approached you without any question from you?" and the foreman responded, "Yes, sir." The jury recommenced deliberations and, after just an hour, returned a verdict of death.

The jury was then polled. The first four jurors were each asked whether they had individually voted to impose the death penalty, and in turn each responded, "Yes." Then the same question was directed to Juror Zadonsky. At first she made no audible response and only nodded. Only after additional questioning by the court did Juror Zadonsky ultimately answer affirmatively.

According to defense counsel's statements to the court at the January 21, 1983, hearing, a defense investigator visited Zadonsky to discuss these matters, but Zadonsky did not answer her door nor respond to a note left for her. Later defense counsel spoke to Zadonsky himself, but she refused to sign any declaration. Defense counsel reported to the court that Zadonsky "simply does not want to be involved in this any more . . . ."

In determining whether there is a reasonable possibility coercion occurred, we attempt to ascertain whether, *from the affected juror's perspective,* the court's remarks tended to displace the juror's independent judgment in favor of considerations of compromise and expediency. (*People v. Carter, supra,* 68 Cal.2d at p. 817; *People v. Crossland* (1960) 182 Cal.App.2d 117, 119 [5 Cal.Rptr. 781]; see *People v. Gainer* (1977) 19 Cal.3d 835, 849-850 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]; *People v. Crowley* (1950) 101 Cal.App.2d 71, 75-79 [224 P.2d 748].) Whether a trial court's statements to the jury amount to coercion of the verdict is

"peculiarly dependent upon the facts of each case" (*People* v. *Burton* (1961) 55 Cal.2d 328, 356 [11 Cal.Rptr. 65, 359 P.2d 433]) viewed against the "totality of applicable circumstances." (*People* v. *Carter, supra,* 68 Cal.2d at p. 817.) The concern is not what the court intended to convey or thought it was conveying but, rather, what the affected juror or jurors could reasonably understand the court's statements to mean. (*People* v. *Crossland, supra,* 182 Cal.App.2d at p. 119; *People* v. *Crowley, supra,* 101 Cal.App.2d at p. 75 et passim; see also *People* v. *Carter, supra,* 68 Cal.2d at p. 816.)

I have not the least doubt that the trial court here was trying very hard to avoid error. I think that accounts for the court's using the language "one or more jurors" when the notes from the jury foreman referred to "one juror" and "a juror." Nevertheless, at the very least the record compels the conclusion there is a realistic possibility Juror Zadonsky was coerced, i.e., that her independent judgment was overridden in favor of considerations of compromise and expediency. Juror Zadonsky well knew she was the lone holdout. (See *People* v. *Carter, supra,* 68 Cal.2d at p. 818; *People* v. *Crowley, supra,* 101 Cal.App.2d at p. 75.) She had already been emotionally upset by the verbal attack against her by a fellow juror angry at her holding out, to the point that she had to leave the jury room. Now the jury was summoned back into the courtroom, and because Juror Zadonsky knew she was the lone holdout, she would reasonably interpret the court's remarks about its having to investigate "one or more jurors" and determine whether "one or more jurors are refusing to adhere to the law and the evidence," and about its having to permit the attorneys to question "one or more jurors," and its directives to "search your conscience" and "recall your oath," as being aimed directly at her.

The court's statements that it had expected a verdict by that afternoon and that it would appreciate a verdict by Monday were particularly unfortunate. "Coercion has been found where the trial court . . . expressed an opinion that a verdict should be reached. (*People* v. *Crossland* (1960) 182 Cal.App.2d 117, 119 [and cases there cited] . . . ; *People* v. *Crowley* (1950) 101 Cal.App.2d 71, 75 . . . .)" (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113].) Juror Zadonsky may well have interpreted these statements as meaning the court *expected* a verdict on Monday and that it wanted *her personally* to resolve any lingering doubts she may have about the appropriateness of imposing the death penalty. It is also highly likely Zadonsky believed that, by agreeing to the death verdict on Monday, she could avoid the threatened investigation by the court and the attorneys of the jury room incident and of her reluctance to vote for death.

I must disagree with the majority's view that the foreman's two notes to the judge "[s]ingly and in combination . . . could mean that a juror *or*

*jurors* were now expressing absolute refusal to consider the death penalty
. . . ." (Maj. opn., at p. 533, *ante*, original italics.) This is not a fair or
accurate characterization of the foreman's notes. The first note stated: "*One
person* doesn't remember that during the jury selection he said we [*sic*]
could vote for the death penalty." (Italics added.) The second note stated:
"Your Honor, we have *a juror* who cannot morally vote for the death
penalty." (Italics added.) In view of the singular terms "One person" and "a
person" used in the notes, the trial judge knew or should have realized there
was a single holdout. Also, from the statement in the second note, "we have
a juror who cannot morally vote for the death penalty," the court was
apprised that that holdout was against the death penalty and in favor of
imposing life without possibility of parole. Thus, the court should have
realized the jury was split 11 to 1 in favor of death.

As this court explained in *People* v. *Carter, supra,* 68 Cal.2d at page 820:
"We have observed . . . that the task of the judge, when dealing with a jury
experiencing difficulty in reaching agreement, is in any case an extremely
delicate one. The sensivity of that task is augmented when it appears that a
small number of jurors opposes the views of the majority, for the tendency
of the majority to attempt to impose its will on the minority by means other
than rational persuasion can only be made greater, and therefore more
pernicious, by intemperate adjurations from the bench." As indicated earli-
er, however, what the court intended is not nearly as significant as what the
affected juror reasonably understood.

I am unconvinced the court's statements on Monday—asking the jury to
disregard any coercive inference from its comments on Friday—had the
curative effect the majority posits. While the court's statements might have
been sufficient to eliminate any misunderstanding if they were uttered on
Friday, by Monday the damage had been done. The quick verdict on Mon-
day, coming as it did on the heels of a tense jury division late Friday,
together with Juror Zadonsky's hesitancy to state the verdict was hers and
her obvious desire to have nothing more to do with the case, persuade me
that the court's specific disclaimer had little effect and that Juror Zadonsky
had over the weekend decided to avoid further trouble by throwing in the
towel.

Obviously, the trial judge made efforts not to coerce the jury. Indeed,
much of the judge's additional instructions were appropriate and, from a
legal standpoint, not erroneous. However, in light of the totality of the
applicable circumstances, "our concern must be what the jury of laymen
may have understood [the judge] to mean . . . ." (*People* v. *Crossland,
supra,* 182 Cal.App.2d at p. 119.) By his remarks of Friday afternoon, the
trial judge inadvertently gave the impression that he believed a verdict
should be easy to reach, that he was surprised a verdict had not been

reached by that time, and that he would appreciate the jury's reaching a verdict on the following Monday. These statements coupled with the court's urging the jurors to search their consciences and recall their oaths could well have been interpreted by the holdout juror as indicating an opinion on the part of the judge that the court expected and wanted a death penalty verdict returned on Monday.

Therefore, I cannot concur in the majority's conclusion that "any potential for improper coercion seems minimal . . . ." (Maj. opn., *ante,* at p. 534.) In my view the record gives rise to a reasonable possibility the holdout juror's vote to impose the death penalty was improperly coerced by the trial court's remarks. Accordingly, I would reverse the judgment as to penalty and remand for a new penalty trial.

Mosk, J., and Broussard, J., concurred.

Appellant's petition for a rehearing was denied October 31, 1988, and the opinion was modified on September 22 and October 31, 1988, to read as printed above. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.